'09 CIV 2592

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

ALLIANZ GLOBAL INVESTORS
KAPITALANLAGESELLSCHAFT MBH;
ALLIANZ GLOBAL INVESTORS
LUXEMBOURG S.A.; ALECTA
PENSIONSFÖRSÄKRING ÖMSESIDGT;
SJUNDE AP-FONDEN; VARMA MUTUAL
PENSION INSURANCE COMPANY; DANSKE
INVEST ADMINISTRATION A/S; AFA
LIVFÖRSÄKRINGSAKTIEBOLAG; AFA
TRYGGHETSFÖRSÄKRINGSAKTIEBOLAG;
AFA SJUKFÖRSÄKRINGSAKTIEBOLAG; AFA
SJUKFÖRSÄKRINGSAKTIEBOLAG ON
BEHALF OF KOLLEKTIVAVTALSSTIFTELSEN
TRYGGHETSFONDEN TSL; AMF PENSION
FONDFÖRVALTNING AB;
ARBETSMARKNADSFÖRSÄKRINGAR;
PENSIONSFÖRSÄKRINGSÄKTIEBOLAG;
PENSIONSKASSERNES ADMINISTRATION
A/S; ARBEJDSMARKEDETS
TILLAEGSPENSION;
INDUSTRIENS PENSIONSFORSIKRING A/S;
ARCA SGR S.p.A.; ILMARINEN MUTUAL
PENSION INSURANCE COMPANY; MONTE
PASCHI ASSET MANAGEMENT S.G.R. S.p.A.;
NORDEA INVEST FUND MANAGEMENT A/S;
NORDEA FONDER AB;  NORDEA
INVESTMENT FUNDS COMPANY I S.A.;
NORDEA FONDENE NORGE AS; NORDEA
FONDBOLAG FINLAND Ab; SWEDBANK
ROBUR FONDER AB; and FJARDE AP-
FONDEN,

        Plaintiffs,

    -against-

GUILLAUME HANNEZO,

        Defendant.

---

Civil Action No.



**JURY TRIAL DEMANDED**

## COMPLAINT

## BASIS OF ALLEGATIONS

Plaintiffs, by their undersigned attorneys, for their Complaint (the "Complaint") allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Plaintiffs' information and belief is based on an investigation (made by and through attorneys), which investigation included, among other things, a review and analysis of public documents pertaining to Defendants; Securities and Exchange Commission (the "SEC" or "Commission") filings; other regulatory filings and reports publicly available; annual reports, press releases, published interviews, news articles and other media reports (whether disseminated in print or by electronic media); pleadings in other litigation pertaining to Defendants; and reports of securities analysts and investor advisory services.

## SUMMARY OF THE COMPLAINT

1.       Plaintiffs bring this action for violation of the federal securities laws and of applicable state law against defendant Guillaume Hannezo, CFO of Vivendi Universal, S.A. ("Vivendi" or the "Company"), until he resigned on July 9, 2002  This case is related to In re Vivendi Universal, S.A. Securities Litigation, 02 Civ. 5571 (RJH) ("the Class Action"), and cases consolidated with the Class Action (collectively "the Consolidated Cases"). Hannezo is a co-defendant with Vivendi and Jean-Marie Messier ("Messier") in the Class Action and certain Consolidated Cases.  Messier was Vivendi's CEO and Chairman (until he was forced to resign on July 3, 2002). Although this complaint is brought solely against Hannezo, this complaint refers to Hannezo, Messier and Vivendi collectively as Defendants..

2.       Vivendi is a media and telecommunications conglomerate with substantial holdings in the United States and Europe.  In December 2000, Vivendi's former parent, Vivendi,

1

S.A., entered into a series of merger transactions (the "Merger"), with The Seagram Company Ltd. ("Seagram") and French cable giant Canal Plus, S.A. ("Canal Plus"). Pursuant to the merger transactions: Vivendi, S.A. merged into its wholly-owned subsidiary, Vivendi Universal, S.A. (previously named Sofiee); Vivendi acquired the businesses of Canal Plus, other than its premium pay television channel, in which it acquired a 49% indirect interest; and Vivendi, through its subsidiaries, merged with Seagram. In July 2002, Vivendi reported that it had experienced a liquidity crisis, which it had improperly failed to disclose. Vivendi also began selling many of its assets to meet its debt obligations.

3.     Prior to this reported liquidity crisis, Defendants committed multiple violations of the antifraud, books and records, internal controls and reporting provisions of the federal securities laws. Between approximately October 30, 2000 and August 14, 2002 (the "Relevant Time Period" or "Loss Period"), Vivendi, under the direction of Messier, Hannezo and/or other executive officers, reported materially false and misleading information about its "EBITDA" growth and liquidity in its SEC filings and public releases. Defendants and other executive officers of Vivendi also, directly or indirectly, were responsible for the improper and fraudulent accounting, thus overstating Vivendi's "EBITDA" in order to meet targets during two quarters in 2001, concealed various material commitments and obligations, and failed to disclose the full extent of Vivendi's involvement in a transaction to purchase shares of Telco, a Polish Telecommunications company.

4.     Prior to and after 2000, Messier took Vivendi on an acquisition binge that, according to published reports, resulted in the Company amassing approximately $18 billion in debt as he turned the Company from a water concern into an entertainment conglomerate. Concomitantly, Mr. Messier orchestrated a scheme to conceal the severity of Vivendi's liquidity

2

problems stemming from the massive debt load incurred as a result of these transactions. In fact, only days before his ouster by Vivendi's Board, Messier caused the Company to issue several press releases that falsely stated that Vivendi did not face an immediate and severe cash shortage that threatened the Company's viability going forward absent an asset fire sale. It was only after Vivendi's Board removed Messier from his position as CEO and Chairman that the Company's new management disclosed the severity of the Company's liquidity crisis and that the Company would have to sell assets and secure immediately both bridge and long-term financing or default on its largest credit obligations.

5.      By way of background, Vivendi, S.A. started out as a small French-based water utility known as Generale des Eaux until April 1999. Immediately prior to and during the Relevant Time Period, Messier caused Vivendi to embark on an extraordinary $77 billion acquisition binge that transformed Vivendi into a huge international conglomerate. In particular, as a result of its three-way, $46 billion Merger with Seagram (the parent of Universal Studios and Universal Music) and Canal Plus (one of Europe's largest cable TV-operators), announced in October 2000, Vivendi instantly became one of the world's largest media and entertainment companies. At all material times set forth herein, Vivendi's "Media and Communications" operations and its "Environmental Services" operations (which include its water utility-subsidiaries) constituted two core areas of the Company's business.

6.      In the period leading up to the October 2000 Merger and thereafter, Defendants reported strong revenue and earnings and falsely portrayed Vivendi as a company that was generating sufficient cash flow to satisfy its debt obligations on approximately $21 billion in debt that it had amassed in connection with financing its $77 billion acquisition spree — even though

3

other media and communication companies in the United States and Europe were suffering
through a period of retrenchment and contraction.

7.      During 2001 and 2002, Vivendi acquired all or a portion of the outstanding shares
or assets of various other media and telecommunications companies, including Houghton Mifflin
Company, MP3.com, USA Networks, Inc., and Maroc Telecom. Until it began disposing of
certain assets in late 2002 to meet its debt obligations, Vivendi was one of Europe's largest
companies in terms of assets and revenues, with holdings in the United States that included
Universal Studios Group, Universal Music Group, and USA Networks, Inc. The cost of these
acquisitions, when combined with the Seagram and Canal Plus purchases, totaled more than $60
billion in cash, stock and assumed debt, and increased the debt associated with Vivendi's "Media
& Communications" division from approximately €3 billion at the beginning of 2000 to over €21
billion in 2002. During the Relevant Time Period the exchange rate for Euros to U.S. Dollars
ranged from a high of approximately €1.18 to the U.S. Dollar to a low of €1.01 to the U.S.
Dollar.

8.      The vast majority of these acquisitions made after the Vivendi/Seagram/Canal
Plus Merger were paid for either using Vivendi stock as currency, or by borrowing against future
earnings. Thus, in order to sustain its growth by acquisition strategy, it was crucial for
Defendants to continue to report favorable financial results in order to keep Vivendi's stock price
high and to maintain its favorable credit ratings and access to additional debt financing.

9.      In July 2002, Messier and Hannezo resigned from their positions with Vivendi,
and the Company's new management disclosed that Vivendi had experienced a liquidity crisis.
The liquidity problem that Vivendi finally began to publicly disclose in July 2002, and did not
fully disclose until August 2002, was a stark contrast to the rosy financial picture that Defendants

4

and other executive officers of Vivendi had presented to the public over the preceding twenty-two months. During the Relevant Time Period, in fact, Defendants and other senior executives of Vivendi engaged in or were responsible for a number of improper practices that produced materially false and misleading EBITDA results and/or concealed Vivendi's true financial condition, including:

- Issuing press releases that falsely portrayed Vivendi's liquidity and cash flow positions;

- Adjusting reserves and engaging in other accounting practices in violation of U.S. GAAP in order to increase Vivendi's EBITDA and meet ambitious earnings targets communicated to the market;

- Improperly consolidating earnings from a subsidiary it did not own a majority of into Vivendi's earnings;

- Failing to disclose the existence of various commitments and contingencies; and

- Failing to disclose part of its investment in Telco.

10.     As a result of Defendants' repeated false and misleading upbeat earnings announcements and assurances concerning the Company's growth and its ability to meet its massive debt obligations during the period from October 30, 2000 to August 14, 2002, the price of Vivendi's American Depository Shares ("ADS") and common stock (or "ordinary shares") was kept artificially inflated and persons (including Plaintiffs) who purchased Vivendi securities were damaged when they bought Vivendi stock at artificially inflated prices which declined in value substantially as the true state of Vivendi's financial condition became known to the public.

## THE PARTIES

### PLAINTIFFS

11.  Plaintiffs are as follows:

    a)    Allianz Global Investors Kapitalanlagesellschaft MBH and Allianz Global Investors, Luxembourg S.A. (together referred to herein as "AGI") was founded in 1956 as DIT (Deustscher Investment Trust) and became AGI in 2007.  AGI is part of the Allianz Global Investors network and the asset management division of Allianz AG.

    b)    Alecta Pensionsförsäkring, Ömsesidgt ("Alecta") manages the Alecta Pension Fund for private clients and institutions.  Based in Stockholm, Sweden and founded in 1917, Alecta is one of the largest providers of occupational pension services in Sweden catering to salaried private-sector employees.

    c)    Sjunde AP-Fonden ("AP7"), or the Seventh Swedish National Pension Fund, is based in Stockholm, Sweden and was founded in 1998.  AP7 is part of the Swedish National Pension Fund (AP Fund) system and manages a portion of the pension assets of the citizens of Sweden.

    d)    Varma Mutual Pension Insurance Company ("Varma") manages the pension assets for the Finnish private sector.  The firm was founded in 1998, following the merger between Sampo Pension and Pension Varma.

    e)    Danske Invest Administration A/S ("Danske") is a Copenhagen, Denmark based mutual fund manager.  Danske is the fund manager and administrator of the Danske family of mutual fund and with assets under

6

management of approximately US $26 billion, it is one of the largest
mutual fund managers in Denmark.

f)     AFA Livförsäkringsaktiebolag; AFA Trygghetsförsäkringsaktiebolag;
       AFA Sjukförsäkringaktiebolag; and AFA Sjukförsäkringaktiebolag on
       behalf of Kollektivavtalsstiftelsen Trygghetsfonden TSL (collectively
       referred to herein as "AFA Insurance") is based in Stockholm, Sweden
       and administers the various insurance policies and services negotiated by
       the three private-sector federations in the labor market, Svenskt
       Näringsliv, LO and PTK, as part of their collective agreements. AFA
       Insurance is also responsible for managing the equity assets related to
       these policies.

g)     AMF Pension Fondförvaltning AB and Arbetsmarknadsförsäkringar
       Pensionsforsakringsktiebolag (collectively "AMF Pension") manages the
       AMF family of mutual funds, as well as separate pension, private client,
       and fixed income portfolios. AMF was established in 1973 as the asset
       management branch of the Stockholm-based AMF insurance group.

h)     Pensionskassernes Adminstration A/S ("PKA"), is Denmark's largest
       administration company for occupational pension funds which represents
       those individuals in the public social and health sectors.

i)     Arbejdsmarkedets Tillaegspension ("ATP") is a self-governing institution
       that has no shareholders and "owns itself under its constitution" under
       Danish law, which was established in 1964 (the "ATP Act") with a view
       to ensuring a larger basic pension for large portions of the Danish

7

population – a supplement to the state retirement pension. ATP is a fully funded insurance scheme and is funded by mandatory contributions from employees and their employers. The amount of the contributions is determined by the Danish government and adjusted from time to time. The fund size is approximately $60 billion. Currently, approximately 4.4 million employees are contributing to the plan and approximately 630,000 pensions and death benefits are being paid.

j)  Industriens Pensionsforsikring A/S ("Industriens") is a Danish pension fund for blue-collar workers across Denmark. The fund serves nearly 450,000 members.

k)  ARCA SGR S.p.A. ("Arca") was established in 1983 and is a Milan, Italy based mutual fund manager.

l)  Ilmarinen Mutual Pension Insurance Company, founded in 1961, is based in Helsinki, Finland and is a mutual pension insurance company with approximately €24 billion in assets under management.

m)  Monte Paschi Asset Management S.G.R. S.p.A is a Milan, Italy based mutual fund manager with approximately $40 billion under management.

n)  Nordea Invest Fund Management A/S ("Nordea Invest") is an investment management company for Danish registered investment funds. Founded in 1990 and based in Copenhagen, Denmark, Nordea Invest has approximately $600 million in assets under management.

o)  Nordea Fonder AB ("Nordea Fonder"), founded in 1976, is part of the Nordea Group - the largest financial services group in the Nordic and

Baltic region. Nordea Fonder manages the Swedish registered mutual
funds of the Nordea Group which comprises assets of over €11 billion.

p)      Nordea Investment Funds Company I S.A. ("Nordea Investment Fund"),
        founded in 1989, is part of the Nordea Group - the largest financial
        services group in the Nordic and Baltic region. Nordea Investment Fund,
        manages the Luxembourg registered funds of the Nordea Group. The
        funds are organized and exist under the law of the Grand Duchy of
        Luxembourg as open ended mutual investment funds (Fonds commun de
        placement) and have assets of approximately €7.3 billion under
        management.

q)      Nordea Fondene Norge AS ("Nordea Fondene"), founded in 1981, is part
        of the Nordea Group - the largest financial services group in the Nordic
        and Baltic region. Nordea Fondene manages the Norwegian registered
        mutual funds of the Nordea Group and has total assets of approximately
        €3.4 billion under management.

r)      Nordea Fondbolag Finland Ab ("Nordea Fondbolag"), founded in 1987,
        is part of the Nordea Group - the largest financial services group in the
        Nordic and Baltic region. Nordea Fondbolag manages the Finnish
        registered mutual funds of the Nordea Group and has total assets of
        approximately €20.1 billion under management.

s)      Swedbank Robur Fonder AB ("Robur") was founded in 1967 as the asset
        management branch of Swedbank and manages the Robur family of
        mutual funds. Based in Stockholm, Sweden, Swedbank is the leading

9

bank in Sweden, Estonia, Latvia and Lithuania with 17,000 employees

serving 9 million private and 475,000 corporate customers.

t)      Fjarde AP-Fonden ("AP4"), or the Fourth Swedish National Pension

Fund, is based in Stockholm, Sweden and manages a portion of the

pension assts of the citizens of Sweden.  AP4 is part of the Swedish

National Pension Fund (AP Fund) system and was founded in 1998.

## THE DEFENDANT AND RELATED PARTIES

12.     Vivendi is a *"société anonyme"* organized under the laws of France and with its

corporate headquarters at 42 Avenue Friedland 75380, Paris, Cedex 08, France.  During 2001

and 2002, Vivendi maintained offices in Paris, France and New York, New York.  Vivendi

became a media and telecommunications conglomerate in December 2000 as a result of the

Merger transactions involving Seagram and Canal Plus.  Vivendi's ordinary shares trade on the

EuroNext Paris, S.A. (the "Paris Bourse"), and its ADSs trade on the New York Stock Exchange

and are registered with the Commission pursuant to Section 12(g) of the Exchange Act, 15

U.S.C. § 78l.  Vivendi operates on a calendar fiscal year and is required to file annual reports

with the SEC on Form 20-F.

13.     Jean-Marie Messier was CEO of Vivendi and its predecessor companies from

1994 until July 2, 2002.  During that time Messier also served as Chairman of Vivendi's Board

of Directors.  Messier is a French citizen who, during the events complained of herein, resided in

New York, New York.

14.     Defendant Guillaume Hannezo was CFO of Vivendi and its predecessor

companies from 1997 until mid-July 2002.  Hannezo is a French citizen who resides in Paris,

France.  From mid-2001 through at least July 2002, Hannezo resided in New York, New York.

10

15.     Messier and Defendant Hannezo are collectively referred to herein as the "Individual Defendants." Vivendi and the Individual Defendants are collectively referred to herein as the "Defendants."[1]

16.     The materially false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein is the collective action of the narrowly defined group of Defendants identified above. The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day to day operation of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business operations, products, growth, financial statements, and financial condition, as alleged herein. The Individual Defendants were involved in drafting, preparation and/or dissemination of the various public, shareholder and investor reports and other communications alleged herein, were aware of, or recklessly disregarded, that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

17.     Because of their Board memberships and/or executive and managerial positions with Vivendi, the Individual Defendants had access to the adverse non-public information about the business, operations, finances, markets, financial statements, and present and future business prospects of Vivendi particularized herein through access to internal corporate documents, conversations or communications with corporate officers or employees, attendance at

---

[1] Although Messier and Vivendi are not named Defendants in this action, they are named Defendants in the Class Action and the Consolidated Cases. Since Plaintiffs anticipate that this action will be consolidated with the Class Action, Plaintiffs use the terms "Individual Defendants" and "Defendants" as used in the Class Action and Consolidated Cases.

11

management and/or Board of Directors' meetings and committees thereof and/or via reports and other information provided to them in connection therewith.

18.     The statements made by the Individual Defendants, as particularized below, were materially false and misleading when made. The true financial and operating condition of the Company, which was known or recklessly disregarded by the Individual Defendants, remained concealed from the investing public throughout the Relevant Time Period. The Individual Defendants, who were under a duty to disclose those facts, instead misrepresented or concealed them during the Relevant Time Period. As officers and directors and controlling persons of a publicly held company whose ADSs were, and are, registered with the SEC pursuant to the Securities and Exchange Act of 1934, were traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to Vivendi's financial condition and liquidity, performance, growth, operations, financial statements, business, products, markets, management, earnings and business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Relevant Time Period violated these specific requirements and obligations.

19.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company issued during the Relevant Time Period. Each Individual Defendant was provided with copies of the documents alleged herein to be materially misleading prior to or shortly after their issuance

and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them but not the public, each of the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the representations concerning the Company complained of herein were then materially false and misleading.  Accordingly, both of the Individual Defendants were responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

20.     Hannezo is liable as a direct participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers or acquirers of Vivendi ADSs and ordinary shares (including Plaintiffs) during the Relevant Time Period by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public (including Plaintiffs) regarding Vivendi's businesses, operations, management and the intrinsic value of Vivendi ADSs and ordinary shares; (ii) enabled the Company to complete numerous acquisitions in its multi-billion dollar buying spree; (iii) permitted Vivendi to maintain its credit ratings so that Vivendi could accumulate more and more debt to make acquisitions on terms favorable to Vivendi; and (iv) caused Plaintiffs and other members of the investing public to purchase or otherwise acquire Vivendi ADSs and ordinary shares at artificially inflated prices, which then lost value when the true state of Vivendi's financial condition became known.

## OTHER RELEVANT ENTITIES

21.     Cegetel Group ("Cegetel"), based in France, is a privately held telecommunications operator of fixed line and mobile telephony and Internet services.  During

the Relevant Time Period, Vivendi, through direct and indirect holdings, owned a substantial ownership interest in Cegetel.

22.     Elektrim Telekomunikacja Sp. zo.o ("Telco"), based in Poland, is a holding company that owns various telecommunications assets.  Vivendi has owned a stake in Telco since 1999.

23.     Maroc Telecom, based in Morocco, is a telecommunications operator of fixed line and mobile telephony and Internet services.  Vivendi acquired a 35% stake in Maroc Telecom in December 2000.

24.     Universal Music Group ("UMG"), based in the United States, is a wholly owned subsidiary of Vivendi.

## JURISDICTION AND VENUE

25.     In this Complaint, Plaintiffs assert claims under and pursuant to Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78(j)(b) and 78t-1(a), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. § 240.10b-5.

26.     This Court has jurisdiction over the subject matter of this action pursuant to: 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

27.     Pursuant to the "effect test" of extraterritorial jurisdiction, this Court may properly exercise subject matter jurisdiction over the claims of all investors who purchased or acquired Vivendi securities traded on U.S. Markets.

28.     This Court may also properly exercise subject matter jurisdiction over the claims of investors (such as Plaintiffs) who acquired Vivendi ordinary shares traded on foreign markets under the "conduct test" articulated by the Second Circuit, which provides that a federal court has subject matter jurisdiction if (1) the defendant's activities in the United States were more

14

than 'merely preparatory' to a securities fraud conducted elsewhere, and (2) these activities or culpable failures to act within the United States 'directly caused' the claimed losses.

29.     Defendants engaged in extensive fraud-related conduct in the U.S., which was part of a single fraudulent scheme spanning the U.S. and France. The domestic conduct was not merely "preparatory" or perfunctory acts, but led directly to losses by both foreign and domestic investors. In addition to the substantial U.S. conduct in furtherance of the fraud, Vivendi has a vast U.S. presence that justifies the exercise of subject matter jurisdiction over the claims of any plaintiff who, relying on the health and value of Vivendi's substantial U.S. businesses, acquired Vivendi securities traded on foreign markets, and was defrauded by Defendants' misrepresentations.

30.     In addition, there was but a single worldwide market for Vivendi shares and ADSs which traded in tandem and that market was defrauded by Defendants' conduct, causing extensive effects both in this country and abroad.

31.     The fraud perpetrated on the worldwide market by Vivendi sprang directly from the Company's $77 billion acquisition spree, during which Vivendi acquired several high profile U.S. companies, spending in excess of $54 billion for its U.S. interests. For example, just prior to and during the Relevant Time Period, the following U.S. companies, among others, were acquired in whole or in part by Vivendi:

| COMPANY ACQUIRED | U.S. LOCATION | PURCHASE PRICE |
|---|---|---|
| Waste Management, Inc. | Houston, Texas | $103.5 million |
| US Filter Corp. | Palm Desert, California | $6.2 billion |
| Seagram Company Ltd. | Universal City, California | $34 billion |
| Uproar.com | New York, New York | $128 million |
| MP3.com, Inc. | San Diego, California | $400 million |

| COMPANY ACQUIRED | U.S. LOCATION | PURCHASE PRICE |
|---|---|---|
| Emusic.com | San Diego, California | $24 million |
| Houghton Mifflin Co. | Boston, Massachusetts | $2.2 billion |
| EchoStar Communications Corp. | Littleton, Colorado | $1.5 billion |
| USA Networks | New York, New York | $10.3 billion |

32.    In addition to Vivendi's U.S. acquisition activities, a significant number of Defendants' false and misleading statements were initially made in the U.S., and all were disseminated within the U.S. Vivendi also regularly filed false and misleading reports with the SEC in the U.S., including Form 20-F Annual Reports and numerous Form 6-K Reports during the Relevant Time Period as alleged herein.

33.    Prior to and during the Relevant Time Period, false and misleading statements not made in the U.S. were disseminated into the U.S. and internationally through the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications and the facilities of the national securities markets.

34.    According to the Company's Form 20-F for the fiscal year ended December 31, 2001, signed and filed with the SEC on May 28, 2002 (the "2001 20-F"), over 54% of Vivendi's long lived assets, valued at €53.522 billion, were located in the U.S. The 2001 20-F also states that Vivendi's 2001 U.S. revenue was purportedly over €12 billion. In a February 17, 2002 interview on CNN, Messier stated that the Company "has 50,000 U.S. employees."

35.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Vivendi is headquartered in Paris, France, but conducts business and maintains the Company's U.S. headquarters in this District. In addition, Messier has resided in this District since 2001 when he moved himself and his family into a $17 million

penthouse apartment in Manhattan. During his February 17, 2002 CNN interview, Messier

explained why he moved to New York:

> Moving to New York, yes there [were] very simple reasons. The first one Vivendi Universal has 50,000 U.S. employees. They have a boss. Where is the boss? The boss is in the U.S. He's working there. I can meet with them. I can spend time with them. He is really the boss.
>
> The second goal was Vivendi International is a new group for many U.S. investors in the media field. We need and I needed to spend more time with the U.S. Universal community to explain the Vivendi Universal story, to go through all reasons of performances of prospects, and I think that it's just better to do it being an American, than being outside.

Similarly, in an interview on "Market Call" from New York on February 27, 2001, Messier

reiterated that one of the primary reasons for moving to New York was to promote Vivendi to

U.S. investors and Wall Street:

> I'm not frustrated. I'm enthusiastic about doing and continuing (ph) and persuading this education job [for American investors and Wall Street analysts]. Since the merger, the level of U.S. investors in all capital has jumped from less than 10 percent to more than 25 percent. I have a very simple goal in mind. I want the level of U.S. investors, within Vivendi Universal, to reach as quickly as possible 50 percent of all capital . . .. I will take any necessary step to convince and educate Wall Street and U.S. investors.

In addition, many of the acts and practices complained of herein, including the dissemination of

materially false and misleading statements occurred in this District.

36.     In connection with the acts alleged in this Complaint, Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including but not limited

to the mails, interstate telephone communications and the facilities of the national securities

markets.

## FACTUAL BACKGROUND

17

37.     In June 1996, Messier became chairman of Generale des Eaux.  At that time, Generale des Eaux was – as it had been since it was founded in the 19th century – primarily a water utility company.  When Messier became CEO in 1996, Vivendi's stock and ADSs were trading in the €27 to €29 and $30 to $35 range, respectively.  Messier changed the name of Generale des Eaux to "Vivendi" in April 1999.

38.     After becoming CEO, Messier embarked on an extraordinarily ambitious plan to turn the Company into one of the world's largest media companies.  Prior to the Relevant Time Period, beginning in 1998, Vivendi acquired the following companies:

| COMPANY ACQUIRED | CLOSING DATE | % ACQUIRED[2] |
|---|---|---|
| Quotidien Sante | 4/9/98 | 100% |
| Linejebuss AB | 4/15/98 | 66.7% (33% owned) |
| Havas SA/Old | 6/2/98 | 70% (30% owned) |
| Cia de Saneamento do Parana | 6/8/98 | 41.38% |
| Ediciones Doyma SA | 6/25/98 | 50% |
| L'Etudient | 11/10/98 | 100% |
| ScVK | 11/18/98 | 43.17% |
| OVP-Vidal | 11/23/98 | 100% |
| Vivendi Universal | 12/15/98 | 10.5% |
| ALPINA GmbH | 1/5/99 | 100% |
| Cendant Software | 1/12/99 | 100% |
| Pathe | 1/26/99 | 19.6% (5% owned) |
| FCC | 3/5/99 | 28% |
| Aique | 4/20/99 | 100% |
| US Filter Corp. | 4/30/99 | 100% |

---

[2]  Pre-existing ownership interest, if any, is shown in parenthesis.

| COMPANY ACQUIRED | CLOSING DATE | % ACQUIRED[2] |
|---|---|---|
| SL Tunnelbanan AB | 5/4/99 | 60% |
| MediMedia | 5/12/99 | 100% |
| 18 Litre Water Division | 5/20/99 | 100% |
| Sani Gestion Inc. | 6/11/99 | 100% |
| MUSIDISC | 6/30/99 | 99.02% |
| Canal Plus | 7/22/99 | 15% (34% owned) |
| British Sky Broadcasting Plc | 7/22/99 | 4% (20.5% owned) |
| Aqua Alliance Inc. | 8/24/99 | 17% (83% owned) |
| Pathe | 9/30/99 | 80.2% (19.8% owned) |
| Superior Services Inc. | 11/11/99 | 100% |
| 23 GPU In. Power plants | 11/24/99 | 100% |
| Elektrim Telekomunikacja | 12/9/99 | 49% |
| Daesan Power Plant | 12/17/99 | 100% |
| The StayWell Company | 2/29/00 | 100% |
| Three V Health Inc. | 2/29/00 | 100% |
| Haniel Rohr; Kanal Service & Haniel Industrie Reinigung | 3/28/00 | 100% |
| Prize Central Network | 3/29/00 | 100% |
| KD Offshore | 5/30/00 | 100% |
| Quod Bonom BV | 8/17/00 | 80% |
| Prelude et Fugue | 9/20/00 | 100% |
| Poland Com SA | 9/21/00 | 55.01% |

39.    Messier's early growth strategy required the Company to finance its acquisitions, which caused the Company to accumulate large amounts of debt.  For example, in March 1999, Vivendi had to finance its $6.2 billion acquisition of U.S. Filter Corp. ("U.S. Filter") by raising approximately €5.7 through a convertible bond offering.  Similarly, in December of 1999,

Vivendi increased its equity investment in Elektrim Telekomunikacja ("Telco"), a Polish conglomerate, to $1.2 billion (or 49% of Telco's equity) by investing an additional $250 million in cash and converting an earlier $615 million loan to Telco shares.

40.     In December 2000, the three-way Merger of Vivendi, Seagram, and Canal Plus closed.

41.     On December 22, 2000, the Financial Times reported that Vivendi had purchased a 35% stake in Maroc Telecom, S.A. ("Maroc Telecom"), Morocco's telephone monopoly, for approximately €2.3 billion.

## RELEVANT ACCOUNTING PRINCIPLES

42.     At all relevant times during the Relevant Time Period, Defendants represented that Vivendi's financial statements when issued were prepared in conformity with Generally Accepted Accounting Principles ("GAAP")[3] in France. However, the Company violated GAAP and SEC reporting requirements by filing periodic reports with the SEC that did not accurately disclose the reasons for the material increases on reported EBITDA and operating earnings during the Relevant Time Period.

43.     Foreign issuers who are required to file annual reports with the Commission report the financial results of their operations in financial statements, which include an income statement and balance sheet, prepared in conformity with GAAP applicable in the United States, their home country, or some other jurisdiction. Foreign issuers include these financial statements in annual reports that they file with the Commission on Forms 20-F. Issuers that submit non-U.S. GAAP financial statements to the Commission must also include in their Forms 20-F,

---

[3]     GAAP is recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time.

among other things, a reconciliation of net income to U.S. GAAP, and may also choose to include other disclosures required by U.S. GAAP. Foreign issuers also disclose other information to the U.S. public on Forms 6-K.

44.      The SEC allows foreign issuers to prepare their financial statements in accordance with a comprehensive body of GAAP other than U.S. GAAP, provided that such statements contain a reconciliation to U.S. GAAP. In this regard, the financial results in Vivendi's consolidated earnings releases issued in the United States during at least portions of the Relevant Time Period were presented as "U.S. GAAP based" or on a "U.S. GAAP basis." Also, during some or all of the Relevant Time Period, U.S. GAAP applied to the financial results of several of Vivendi's business units, including Cegetel and UMG.

45.      Item 18 of Form 20-F provides, among other things, that the financial statements shall disclose an informational content substantially similar to financial statements that comply with United States GAAP and SEC Regulation S-X. Item 18 also provides that the financial statements contain a discussion of the material variations in accounting principles, practices and methods from those generally accepted in the U.S. and a quantification of each material variation.

46.      A company's income statement reports, among other things, revenue recognized, expenses incurred, and income earned during a stated period of time. Within an income statement, expenses are generally subtracted from revenues to calculate net income. A company's balance sheet reports, among other things, the assets and liabilities of a company at a point in time, usually as of the end of the company's fiscal quarter or fiscal year.

47.      During the Relevant Time Period, Vivendi was a foreign issuer whose primary place of reporting and listing was in Paris, France. Vivendi was also required to file its annual

21

consolidated financial statements with the Commission on Forms 20-F.  Vivendi also furnished

certain information to the Commission on Forms 6-K during the Relevant Time Period.  Also

during the Relevant Time Period, Vivendi filed financial information in France with the

Commission des Opérations de Bourse ("COB").

48.     During the Relevant Time Period, Vivendi's consolidated financial statements

were prepared in conformity with French GAAP.  However, the financial results in Vivendi's

consolidated earnings releases issued in the United States during at least portions of the Relevant

Time Period were presented as "U.S. GAAP based" or on a "U.S. GAAP basis."  Also, during

some or all of the Relevant Time Period, U.S. GAAP applied to the financial results of several of

Vivendi's business units, including Cegetel and UMG.

49.     As set forth in Financial Accounting Standards Board ("FASB") Statement of

Financial Accountings Concepts ("Concepts Statement") No. 1, one of the fundamental

objectives of financial reporting is that it provide accurate and reliable information concerning an

entity's financial performance during the period being presented.  Concepts Statement No. 1,

paragraph 42, states:

> Financial reporting should provide information about an
> enterprise's financial performance during a period.  Investors and
> creditors often use information about the past to help in assessing
> the prospects of an enterprise.  Thus, although investment and
> credit decisions reflect investors' and creditors' expectations about
> future enterprise performance, those expectations are commonly
> based at least partly on evaluations of past enterprise performance.

50.     As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements

filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be

misleading or inaccurate."  17 C.F.R. § 210.4-01(a)(1).  Management is responsible for preparing

financial statements that conform with GAAP.  As noted by the AICPA professional standards:

> [f]inancial statements are management's responsibility . . ..
> [M]anagement is responsible for adopting sound accounting
> policies and for establishing and maintaining internal control that
> will, among other things, initiate, record, process, and report
> transactions (as well as events and conditions) consistent with
> management's assertions embodied in the financial statements.
> The entity's transactions and the related assets, liabilities and
> equity are within the direct knowledge and control of management
> . . . . Thus, the fair presentation of financial statements in
> conformity with generally accepted accounting principles is an
> implicit and integral part of management's responsibility.

51.     During the Relevant Time Period, Vivendi emphasized two non-U.S. GAAP

measurements when it announced its financial results to the public.  First, Vivendi typically

announced in press releases and other public statements its earnings before interest, taxes,

depreciation, and amortization, which is commonly known as EBITDA.  Second, Vivendi

reported its "Operating Free Cash Flow" (also referred to as "Operational Free Cash Flow"),

which Vivendi defined in its earnings releases as "EBITDA minus capital spending minus

changes in working capital minus other expenses."

## DEFENDANTS' VIOLATION OF GAAP AND SEC RULES

52.     Vivendi's materially false and misleading financial statements resulted from a

series of deliberate senior management decisions designed to conceal the truth regarding

Vivendi's actual financial position and operating results.  Defendants caused the Company to

violate GAAP and SEC rules by, among other things:

>   a.   Causing Cegetel to improperly depart from its historical
>        practices in accounting for bad debt expense, thereby reducing
>        bad debt expense and overstating accounts receivables;
>
>   b.   Causing Cegetel to improperly defer approximately €14
>        million in provisions for potential future payments and
>        potential liabilities that Cegetel should have booked in 3Q:01;
>
>   c.   Causing UMG to improperly accelerate €3 million in deferred
>        revenue;

23

d.  Causing UMG to improperly reduce the amount of corporate
overhead charges allocated to UMG; and

e.  Improperly consolidating Maroc Telecom's operating results
with Vivendi's.

## DEFENDANTS' IMPROPER ACCOUNTING AT CEGETEL

### Defendants Improperly Accounted For Bad Debts

53.    Vivendi's reported financial results during the Relevant Time Period were

materially false and misleading because Defendants caused the Company to improperly depart

from its historical methodology for determining the level of its reserve for bad debts during the

second quarter of 2001, thus overstating the Company's accounts receivables, total assets,

stockholders' equity and earnings.  That improper departure caused Cegetel's bad debts reserve

for the second quarter of 2001 to be €45 million lower than its historical methodology required.

As a result, Vivendi's overall EBITDA and operating income for the second quarter of 2001 was

increased by the same amount.

54.    Under U.S. GAAP, Statement of Financial Accounting Standards ("SFAS") No.

5, *Accounting for Contingencies* precludes the use of reserves, including excess reserves, for

general or unknown business risks, and the systemic or timed release of reserves into income.

Further, SFAS No. 5, paragraph 23, states that an estimate of losses on accounts receivable

"normally depend[s] on, among other things, the experience of the enterprise . . . and appraisal of

the receivables in light of the current economic environment."  As Defendants knew or were

reckless in not knowing, Cegetel reduced its provision for bad debts during the second quarter of

2001 at a time when Cegetel was actually having more difficulty collecting on its bad debts.

55.    In addition, Accounting Research Bulletin ("ARB") No. 43, Chapter 3, Section A.

9 provides that the objective of providing for reserves against receivables is to assure that,

"[a]ccounts receivable net of allowances for uncollectible accounts . . . are effectively stated at the amount of cash estimated as realizable."

56.     During the Relevant Time Period, Vivendi changed its historical methodology for determining the level of its reserve for bad debts during the second quarter of 2001. As a result of the change, the Company experienced a material gain in EBITDA and achieved its earnings estimates. Vivendi, however, failed to disclose the change and the effects of the change on reported earnings as required by GAAP.

**Defendants Improperly Deferred**
**Provisions For Potential Future Payments And Potential Liabilities**

57.     In addition, Defendants improperly deferred to the third quarter of 2001 approximately €14 million in provisions for potential future payments and potential liabilities that according to GAAP Defendants should have recorded in the second quarter of 2001, thus understating liabilities and expenses and overstating stockholders' equity and earnings.

58.     GAAP normally reflects the application of the "all-inclusive" income statement concept. This concept recognizes all income and expenses, even irregularly occurring losses or costs, in the results of operations in the period incurred, unless GAAP provides otherwise. This "all-inclusive" concept "is intended, among other things, to avoid discretionary omissions of losses (or gains) from an income statement, thereby avoiding presentation of a more (or less) favorable report of performance . . . than is justified." Concepts Statement No. 5, Recognition and Measurement in Financial Statements of Business Enterprises, ¶ 35.

59.     In addition, GAAP states that the "recognition of revenues, expenses, gains, and losses and the related increments or decrements in assets and liabilities—including matching of costs and revenues, allocation, and amortization—is the essence of using accrual accounting to

25

measure performance of business enterprises. The goal of accrual accounting for a business enterprise is to account in the periods in which they occur for the effects of transactions and other events and circumstances, to the extent that those financial effects are recognizable and measurable." Concepts Statement No. 3, Elements of Financial Statements of Business Enterprises, ¶ 85.

60.    As a result of improper accounting, the Company's books improperly reflected material increases in EBITDA and falsely indicated that the Company achieved its earnings estimates. Altogether, the foregoing improper adjustments at Cegetel totaled €59 million and enabled Vivendi to show overall EBITDA growth of 35% for the second quarter of 2001. Vivendi, however, failed to disclose the reasons for the substantial EBITDA increases and its impact on reported earnings as required by SEC reporting requirements.

61.    Defendants knew or recklessly disregarded that the Company's public filings during the Relevant Time Period failed to comply with the disclosure obligations under the SEC's rules and regulations, including, among other things, the rules and regulations concerning Management's Discussion and Analysis of Financial Condition and Results of Operations. See 17 C.F.R. §229.303.

62.    During the Relevant Time Period, Defendants favorably compared Vivendi's results for the comparable period of the prior year but failed to disclose that those results were not comparable since: (i) Vivendi changed its historical methodology for determining the level of its reserve for bad debts related to accounts receivables; and (ii) Vivendi improperly deferred to the third quarter of 2001 approximately €14 million in provisions for potential future payments and potential liabilities that Cegetel properly should have booked in the second quarter of 2001. For example, in a press release dated July 23, 2001 Defendants disclosed that "[f]or the first half

of 2001, the company generated strong EBITDA growth of 77% to 2.2 billion euros versus pro forma results for the first half of the prior year (62% excluding Maroc Telecom)."

63.    Additionally, APB Opinion No. 22, <u>Disclosure of Accounting Policies</u>, ¶ 7, provides that "the usefulness of financial statements . . . [in] making economic decisions . . . depends significantly upon the user's understanding of the accounting policies followed" by a company.  In fact, GAAP states that information about the accounting policies adopted by a reporting company is "essential for financial statement users."  *Id.* at ¶ 8.  Accordingly, GAAP, in paragraph 12 of APB Opinion No. 22 provides:

> In general, the disclosure should encompass important judgments as to appropriateness of principles relating to recognition of revenue and allocation of asset costs to current and future periods; in particular, it should encompass those accounting principles and methods that involve any of the following:
>
> a.   A selection from existing acceptable alternatives;
>
> b.   Principles and methods peculiar to the industry in which the reporting entity operates, even if such principles and methods are predominantly followed in that industry;
>
> c.   Unusual or innovative applications of generally accepted accounting principles (and, as applicable, of principles and methods peculiar to the industry in which the reporting entity operates).

64.    Vivendi's Relevant Time Period financial statements were thus also false and misleading and failed to comply with GAAP because they improperly failed to identify and describe important judgments associated with its change of its historical methodology for determining the level of its reserve for bad debts related to accounts receivables.  Accordingly, investors were unable to assess the appropriateness of, or the risks associated with, Vivendi's financial reporting.

## THE DEFENDANTS' IMPROPER ACCOUNTING AT UMG

### Defendants Caused UMG To Improperly
### Accelerate €3 Million In Deferred Revenue

65.     Vivendi's Relevant Time Period financial statements were also materially false and misleading because the Defendants caused UMG to improperly accelerate approximately €3 million in deferred revenue that it received in connection with a contract between UMG and other parties. During the quarter ended September 30, 2001, UMG had deferred recognizing the €3 million payment it received on the basis that this payment would have to be refunded if Vivendi and the other parties to the contract failed to meet certain conditions by mid-December 2001. The recognition of this €3 million payment as income in the third quarter of 2001 was not in conformity with U.S. GAAP because those conditions were not met during the third quarter, and the payment remained refundable.

66.     Concepts Statement No. 5 states that revenue cannot be recognized until it is earned and that revenue is earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues. Defendants violated a fundamental tenet of GAAP, that "[i]n assessing the prospect that as yet uncompleted transactions will be concluded successfully, a degree of skepticism is often warranted." Concepts Statement No. 5, ¶ 81.

67.     Accordingly, "as a reaction to uncertainty, more stringent requirements historically have been imposed for recognizing revenues and gains than for recognizing expenses and losses, and those conservative reactions influence the guidance for applying the recognition criteria to components of earnings." *Id.*

**Defendants Caused UMG To Improperly Reduce**
**The Amount Of Corporate Overhead Charges Allocated To UMG**

68.     In late October 2001, Vivendi improperly reduced the amount of corporate overhead charges it allocated to UMG by €7 million. This reduction in the corporate overhead charges equaled the exact amount of additional earnings that Defendants determined that UMG needed in order to reach €250 million in EBITDA for the quarter ended September 30, 2001.

69.     This overhead allocation was not in conformity with Concepts Statement No. 6, Elements of Financial Statements, which states that allocations are assigned and distributed "according to a plan or a formula." ¶ 142. Further, SFAS No. 131, Disclosures about Segments of an Enterprise and Related Information, provides that amounts allocated to reported segment profit or loss "shall be allocated on a reasonable basis." ¶ 29. During the third quarter of 2001, Defendants based the overhead allocation charged to UMG not on a plan or formula, but primarily on a desire to reach a specific EBITDA target. This conduct was in contravention of both Concepts Statement No. 6 and SFAS No. 131.

70.     Defendants caused Vivendi's results to not be in conformity with U.S. GAAP, and incorporated these inflated results into Vivendi's earnings releases. These practices caused Vivendi's financial reports, press releases, and other market communications to be materially false and misleading. During the third quarter of 2001, the Defendants favorably compared Vivendi's results for the comparable period of the prior year but failed to disclose that those results were not comparable or sustainable, since Vivendi's EBITDA included: (i) approximately €3 million in improperly accelerated deferred revenue that it received in connection with a contract between UMG and other parties; and (ii) Vivendi improperly reduced the amount of corporate overhead charges it allocated to UMG by €7 million. For example, in Vivendi's third quarter 2001 press release on October 30, 2001, Messier stated that Vivendi's "'third quarter

29

results for the media and communications businesses, with 24% revenue and 90% EBITDA

growth, including organic growth of 8% and 36% respectively, are obviously strong despite the

tough environment . . . .'" Messier went on to say that the financial results "'reflect both our

higher potential for growth and greater resiliency to recessionary environments compared to

many of our peers.'"

## THE DEFENDANTS VIOLATED SEC RULES

71.     Defendants knew or recklessly disregarded that the Company's public filings

during the Relevant Time Period were materially false and misleading because they failed to

comply with the disclosure obligations under the SEC's rules and regulations, including, among

other things, the rules and regulations concerning Management's Discussion and Analysis of

Financial Condition and Results of Operations ("MD&A"). *See* 17 C.F.R. §229.303. In this

regard, Defendants knew that their MD&A disclosures were false and misleading because: (i)

Vivendi changed its historical methodology for determining the level of its reserve for bad debts

related to accounts receivables; (ii) Vivendi improperly deferred to the third quarter of 2001

approximately €14 million in provisions for potential future payments and potential liabilities

that Cegetel properly should have booked in the second quarter of 2001; (iii) Vivendi improperly

accelerated approximately €3 million in deferred revenue that it received in connection with a

contract between UMG and other parties; and (iv) Vivendi improperly reduced the amount of

corporate overhead charges it allocated to UMG by €7 million.

72.     In Vivendi's 2001 20-F, Defendants disclosed the following:

> Total operating income more than doubled to €3.8 billion.
> Operating income generated by our core businesses, at €3.8 billion,
> increased 145%, of which 59% was due to the inclusion of a full
> twelve-month results of the acquired Seagram's operations in 2001
> (compared to twenty-three days in 2000), 38% resulted from the
> 2001 acquisitions of Maroc Telecom, Houghton Mifflin and
> MP3.com, and the remaining 48% was generated by a combination

30

> of organic growth and the impact of less significant acquisitions
> and disposals.

73.     The above disclosure was materially false and misleading because Defendants

failed to describe that the operating income increases were due to, among other things: (i)

Vivendi changing its historical methodology for determining the level of its reserve for bad debts

related to accounts receivables; (ii) Vivendi improperly deferring to the third quarter of 2001

approximately €14 million in provisions for potential future payments and potential liabilities

that Cegetel properly should have booked in the second quarter of 2001; (iii) Vivendi improperly

accelerating approximately €3 million in deferred revenue that it received in connection with a

contract between UMG and other parties; and (iv) Vivendi improperly reducing the amount of

corporate overhead charges it allocated to UMG by €7 million.  Item 303 of Regulation S-K

requires public companies to:

> Describe any unusual or infrequent events or transactions or any
> significant economic changes that materially affected the amount
> of reported income from continuing operations and, in each case,
> indicate the extent to which income was so affected.  In addition,
> describe any other significant components of revenues or expenses
> that, in the registrant's judgment, should be described in order to
> understand the registrant's results of operations.

Item 303 of Regulation S-K, 17 C.F.R. § 229.303(a)(3)(i).  Paragraph 4 of the Instructions to

Paragraph 303(a) states:

> Where the consolidated financial statements reveal material changes from year to
> year in one or more line items, the causes for the changes shall be described to the
> extent necessary to an understanding of the registrant's businesses as a whole . . .

74.     It is precisely because such "qualitative" information is important to investors that

the SEC requires corporations to discuss their businesses and interpret their results.  As the

Securities Act Release No. 6711 states:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A [Management Discussion and Analysis] is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company.

75.    Similarly, Concepts Statement No. 1 states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

¶ 42.

76.    In addition, the SEC, in its May 18, 1989 Interpretive Release No. 34-26831, has

indicated that registrants should employ the following two-step analysis in determining when a

known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item

303 of Regulation S-K:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effect on the registrant's financial condition or results of operations.

77.    According to Securities Act Release No. 6349:

> [i]t is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company.

78.    Accordingly, in reporting its improved EBITDA and operating earnings during

the Relevant Time Period, Vivendi failed to disclose that a material element of those improved

results was because: (i) Vivendi changed its historical methodology for determining the level of

its reserve for bad debts related to accounts receivables; (ii) Vivendi improperly deferred to the third quarter of 2001 approximately €14 million in provisions for potential future payments and potential liabilities that Cegetel properly should have booked in the second quarter of 2001; (iii) Vivendi improperly accelerated approximately €3 million in deferred revenue that it received in connection with a contract between UMG and other parties; and (iv) Vivendi improperly reduced the amount of corporate overhead charges it allocated to UMG by €7 million, even though SEC rules required such disclosures. Indeed, it was material for investors and the market to know whether Vivendi's EBITDA and operating earnings were sustainable. Accordingly, Vivendi's failure to identify to investors the true source of its EBITDA acted as an implicit, and false, representation that such EBITDA and operating earnings was sustainable.

### VIVENDI'S FINANCIAL STATEMENTS WERE MATERIALLY FALSE AND MISLEADING BECAUSE VIVENDI DID NOT POSSESS CONTROLLING FINANCIAL INTEREST IN AT LEAST ITS MAROC TELECOM SUBSIDIARY AND COULD NOT PROPERLY CONSOLIDATE ITS RESULTS

79.     Vivendi did not possess controlling financial interest in at least its Maroc Telecom subsidiary and therefore should not have consolidated the financial statements of that company with its own. In so doing, Vivendi overstated its reported revenue, operating income and EBITDA and inflated its reported growth rates throughout the Relevant Time Period.

### Defendants Knew Or Recklessly Disregarded That Vivendi Did Not Have A Sufficient Ownership Interest To Properly Consolidate Maroc

80.     Defendants knew or recklessly disregarded that Vivendi did not have a sufficient ownership interest in Maroc Telecom in order to properly consolidate its financial results with and into Vivendi's under U.S. GAAP. During the Relevant Time Period, in contravention of GAAP, Vivendi improperly consolidated 100% of Maroc Telecom's earnings and cash flows, which accounted for a significant portion of the cash flows of Vivendi Universal, despite the fact

that it had a direct and indirect ownership interest in Maroc Telecom of only 35%. ARB No. 51, as amended by SFAS No. 94, requires that all investments in which a parent company has a "controlling financial interest," which is typically represented by the "ownership of a majority voting interest" (more than 50%), be consolidated. ARB No. 51 ¶ 2; SFAS No 94 ¶ 2. While ARB No. 51 and SFAS No 94 acknowledge exceptions to this general rule, a controlling financial interest is the principal condition for determining consolidation. *See* SFAS No 94 ¶¶ 1-2. In Vivendi's 2001 20-F, Defendants disclosed that:

> In the course of the partial privatization of Maroc Telecom,
> Vivendi Universal was chosen to be a strategic partner in the
> purchase of an interest in Morocco's national telecommunications
> operator for approximately €2.4 billion. The transaction was
> finalized in April 2001, at which time Maroc Telecom began to be
> consolidated in the accounts of Vivendi Universal, as we obtained
> control through majority board representation and share voting
> rights.

81.     Defendants knew or recklessly disregarded that the above disclosure was materially false and misleading because Vivendi did not establish a controlling financial interest through the shareholders' agreement to properly consolidate Maroc under EITF 97-2. An entity can establish a controlling financial interest through a shareholder's agreement if the entity has both "control" and a "financial interest," analyzed under six requirements. Here, the four most pertinent of the six requirements are:

1.  Whether Vivendi exercised exclusive authority over all decision-making related to ongoing, major, or central operations of Maroc.

2.  Whether Vivendi exercised exclusive authority over all decision-making related to total compensation, as well as the ability to establish and implement hiring guidelines.

3.  Whether Vivendi had a significant financial interest that was unilaterally salable or transferable.

34

4. Whether Vivendi had a significant financial interest that provided the right to receive income, both as ongoing fees and as proceeds from the sale of its interest in Maroc.

82.     Defendants knew or recklessly disregarded that Vivendi did not exercise control over Maroc as defined by EITF 97-2.  EITF 97-2 defines control as having "exclusive authority over all decision making related to both of the following: [o]ngoing, major, or central operations . . . [and] [t]otal . . . compensation . . . as well as the ability to establish and implement guidelines for the selection, hiring, and firing . . . ."

83.     Indeed, Vivendi did not have the ability to exercise exclusive authority over all decision-making related to ongoing, major, or central operations.  Under the original agreement between Vivendi and Maroc, senior management bodies were to be composed of (a) the Executive Board, with five members, of which two were from the Kingdom of Morocco and the rest representing Vivendi; (b) the Supervisory Board, with eight members, of which five represented the Kingdom of Morocco and three Vivendi; and (c) the general shareholders, with 65 percent of the voting rights going to the Kingdom of Morocco and 35 percent to Vivendi.  *See* Sanction Ruling Concerning Messier, Hannezo and the Vivendi Universal Co., at 11.

84.     In this regard, Defendants knew, or were reckless in not knowing, that Maroc Telecom would be managed by a Supervisory Board and a Board of Directors.  Vivendi would have three of the five seats on the Board of Directors.  Most decisions, however, require Supervisory Board approval with qualified majority.  As a consequence, Vivendi would have "very limited management" over the Maroc Telecom Company.

85.     The Supervisory Board had an integral role with respect to finance and operations, particularly decisions involving changes in accounting methods, creating significant subsidiaries, equity acquisitions and changes to the by-laws, all of which required a qualified

35

majority of six of the eight members. *Id.* Accordingly, because each member of the Executive Board had a veto right concerning Maroc's "finance and operations decisions," Vivendi did not have the ability to exercise exclusive authority over all decision-making related to ongoing, major, or central operations. Indeed, Maroc was controlled by the Supervisory Board, which was operated by consensus, and therefore, did not allow for Vivendi to exercise exclusive authority, as defined under EITF 97-2.

86.     Defendants knew or recklessly disregarded that Vivendi did not have a significant financial interest as defined by EITF 97-2. Under EITF 97-2, a significant financial interest must fulfill two requirements: it must be "unilaterally salable or transferable . . . [and must] [p]rovide[] . . . the right to receive income, both as ongoing fees and as proceeds from the sale of its interest . . . in an amount that fluctuates based on the performance of the operations . . . and the change in the fair value thereof."

87.     Vivendi did not have the right to receive income, since it did not have access to Maroc's "cash flow because it [did not] meet the French requirement of 95-per-cent or greater ownership." 'Vivendi is like a stray ship' Chairman has to persuade investors he has a coherent plan for his conglomerate, The Gazette (Montreal, Quebec) (Mar. 30, 2002). Thus, because of Vivendi's inability to access Maroc's earnings and cash flow, consolidation was improper under EITF 97-2.

88.     In addition, under French GAAP, exclusive control and the power to direct the financial and operational policies of an enterprise is required in order to consolidate results. Furthermore, French GAAP states that enterprises are *excluded* from consolidation where severe and long lasting restrictions substantially call into question the control or influence exercised over the enterprise. (*See* Commercial Code, Article L33-19)

36

89.     Additionally, due to Vivendi's inability to access Maroc's cash flows, Vivendi's representations in its financial statements that included Maroc's cash flows were materially false and misleading.  For example, SFAS No. 95 states that "[t]he primary purpose of a statement of cash flows is to provide relevant information about the cash receipts and cash payments of an enterprise during a period."  SFAS No. 95 ¶ 4.  Additionally, the statement of cash flows should, among other things, help investors to:

- "assess the enterprise's ability to generate positive future net cash flows"; [and]

- "assess the enterprise's ability to meet its obligations, its ability to pay dividends, and its needs for external financing[.]"

*Id.* ¶ 5.

90.     Thus, Vivendi's inclusion of Maroc's cash flow was materially false and misleading because, among other things, as a result of its inclusion, Vivendi's cash flows: (i) did not provide relevant information about cash receipts or cash payments; and (ii) did not allow investors to assess Vivendi's ability to meet its obligations, pay dividends, and its needs for external financing.

91.     Additionally, Vivendi's inclusion of Maroc's cash flows in Vivendi's financial statements was false and misleading because Vivendi did not have access to the cash flow based on French common law and thus it did not allow investors to properly assess Vivendi's ability to meet its obligations, pay its dividends, and meet its needs for external financing.  Moreover, it did not have a significant financial interest as defined by EITF 97-2 because it did not have the right to receive income or cash flows from Maroc.

92.     During 2001 and early 2002 Defendants also caused Vivendi's public filings to be false and misleading because they failed to disclose a secret side agreement that Vivendi entered

in February 2001, requiring it to purchase an additional €1.1 billion stake in Maroc Telecom.

Instruction 3 to Item 303(a) states: "The discussion and analysis shall focus specifically on

material events and uncertainties known to management that would cause reported financial

information not to be necessarily indicative of future operating results . . . ."

93.     Also, in its April 17, 1987 Securities Act Release No. 6711, the SEC has indicated

that:

> The Commission has long recognized the need for a narrative
> explanation of the financial statements, because a numerical
> presentation and brief accompanying footnotes alone may be
> insufficient for an investor to judge the quality of earnings and the
> likelihood that past performance is indicative of future
> performance.  MD&A is intended to give the investor an
> opportunity to look at the company through the eyes of
> management by providing both a short and long-term analysis of
> the business of the company.

94.     Defendants were motivated to gain control of Maroc and consolidate its results

due to the fact that Maroc Telecom carried little debt and generated additional EBITDA.

Therefore, in February 2001 Vivendi and the Moroccan government entered into a side

agreement that required Vivendi to purchase an additional 16 percent of Maroc's shares by

February 20, 2002 for approximately €1.1 billion, contingent on the Moroccan government

exercising an irrevocable put.  In exchange, the Moroccan government granted Vivendi certain

management rights over the operation of Maroc Telecom upon which Vivendi based its

consolidation of Maroc Telecom.

95.     Defendants knew or recklessly disregarded that if Vivendi had properly disclosed

the existence of, and the terms of, the secret side agreement, and in particular Vivendi's

obligation to purchase an additional 16 per cent interest in Maroc, the public would have been

alerted to Vivendi's future cash requirements and consequently the market price of Vivendi's

securities would have reflected concern about Vivendi's ability to meet its cash needs.

96.     Vivendi failed to disclose these facts in its public filings with the SEC, the COB,

and in other public statements that it made in 2001 and early 2002.

97.     For example, in its 2000 20-F filed on July 2, 2001, Vivendi stated:

> In December 2000, we announced that we had acquired a 35%
> stake in Moroccan telecommunications operator Maroc Telecom
> for approximately €2.3 billion.  Maroc Telecom, which operates
> fixed-line and mobile telephone networks in Morocco, is estimated
> to have generated revenue of approximately €1.3 billion in 2000.
> In cooperation with Maroc Telecom, we intend to contribute our
> telecoms experience to the modernization of the
> telecommunications industry in Morocco.

The 2000 20-F was false and misleading, as it did not disclose the Maroc Telecom side

agreement.

98.     Vivendi also failed to disclose its commitment with respect to Maroc Telecom in

its periodic filing with the COB for the six-month period ended June 30, 2001.  On October 17,

2001, Vivendi attached an English translation of that filing to a Form 6-K filed with the SEC.

The COB filing and Form 6-K were reviewed and approved by Individual Defendants Messier

and Hannezo and other senior Vivendi executives.

99.     Vivendi also failed to disclose the Maroc Telecom side agreement to analysts

from Moody's Investors Services ("Moody's") and Standard & Poor's during the December

2001 "pre-clearance" meetings regarding the USA Networks and Echostar transactions.

Defendants knew that if they had disclosed the existence of the Maroc Telecom put option, the

credit rating agencies may have downgraded their credit rating of Vivendi.

100.    In February 2002, Vivendi and the Moroccan government agreed to extend the

deadline for the irrevocable put option to September 2005.  Vivendi finally disclosed the

renegotiated side agreement in its 2001 20-F, which was not filed until May 28, 2002:

In connection with its interest in Maroc Telecom, Vivendi Universal and the Kingdom of Morocco contracted a reciprocal call and put option related to a 16% interest in Maroc Telecom currently held by the Kingdom of Morocco. The options can be exercised from September 1, 2003 to June 1, 2005 between the parties at then fair value, except if before September 1, 2003, the Kingdom of Morocco places this 16% interest with a third party investor or if Vivendi Universal exercises preemption rights.

101.    Accordingly, Vivendi's financial statements during the Relevant Time Period were materially false and misleading because Defendants improperly consolidated Maroc, in contravention of GAAP.

**Additional GAAP Violations**

102.    As a result of the foregoing, Defendants caused Vivendi's reported financial results to violate, among other things, the following provisions of GAAP for which each Defendant is necessarily responsible:

a.    The principle that "[f]inancial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions" (Concepts Statement No. 1, ¶ 34);

b.    The principle that "[f]inancial reporting should provide information about the economic resources of an enterprise, the claims to those resources . . . and the effects of transactions, events and circumstances that change resources and claims to those resources" (Concepts Statement No. 1, ¶ 40);

c.    The principle that "[f]inancial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it . . . To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general" (Concepts Statement No. 1, ¶ 50);

d.   The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, <u>Qualitative Characteristics of Accounting Information</u> ¶¶ 58-59 (May 1980));

e.   The principle of completeness, which means that nothing "is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" (Concepts Statement No. 2, ¶ 79); and

f.   The principle that conservatism be used as a "prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered . . . The best way to avoid injury to investors . . . is to try to ensure that what is reported represents what it purports to represent" (Concepts Statement No. 2, ¶¶ 95, 97).

## OCTOBER 2000 – THE FRAUDULENT STATEMENTS BEGIN

103.   On October 30, 2000, Vivendi issued a Registration Statement filed on Form F-4 with the SEC and signed by Individual Defendants Messier and Hannezo in connection with the Merger of Vivendi, Seagram and Canal Plus. The October 30, 2000 Form F-4 included a Joint Proxy Statement Prospectus, which was then mailed to Seagram security-holders and U.S. security-holders of Canal Plus and Vivendi S.A. beginning on November 3, 2000. The Joint Proxy Statement Prospectus included in the Form F-4 and then mailed to stockholders – consisting of over 700 pages plus exhibits – purported to explain and solicit shareholder approval for the three-way Merger. Among other information, in its Form F-4 Vivendi presented historical financial statements for FY 1999 and the first half of FY 2000. Vivendi reported revenue of $16.247 billion and net income of $509 million for the first half of FY 2000, and revenue of $17.487 billion and net income of $254.6 million for the comparable period in 1999.

41

Vivendi also reported shareholders' equity of $11.957 billion and total assets of $73.611 billion as of June 30, 2000.

104.  However, Vivendi's historical financial statements contained in Vivendi's October 30, 2000 Form F-4 were materially false and misleading because, *inter alia*, Defendants were engaged in improper accounting practices which had the effect of materially overstating Vivendi's reported earnings and which failed to disclose Vivendi's growing cash flow problems and lack of liquidity, including: (a) improperly failing to disclose material commitments relating to its Cegetel subsidiary which had they been disclosed would have raised concerns in the market about the Company's liquidity and ability to access cash to meet its cash needs; (b) failing to disclose important legal restrictions on its ability to unilaterally access cash flow of subsidiary Cegetel; and (c) overstating the Company's revenue from certain multi-year contracts. In addition, Defendants failed to disclose that Vivendi was suffering from a growing liquidity crisis and that it would necessarily need to sell valuable assets and/or restructure its debt obligations in order to remain solvent and avoid bankruptcy.

105.  On February 14, 2001, Vivendi issued a press release in Paris and New York announcing preliminary results for FY 2000:

> Vivendi Universal's preliminary total revenues for 2000 totaled 41.7 billion Euros with media and communications and environmental services, accounting for 40.0 billion Euros, a global 36.5% increase over 1999.
>
> Jean-Marie Messier, Chairman and CEO of Vivendi Universal said, "Vivendi Universal was created on December 8, 2000. The 2000 Vivendi figures are showing the considerable burst of growth of our communications activities in 2000 both in global growth and even more important with a near 20% internal growth. *Vivendi Universal enters its first full year of operations with strong growth prospects and a very strong balance sheet. This new company is off to a fast start and we are very confident that we will meet the very aggressive growth targets we have set for*

42

*ourselves both at the revenues and EBITDA levels."* [emphasis added]

106.    On March 9, 2001, Vivendi issued a press release reporting "better than expected"

fourth quarter and FY 2000 results. Vivendi announced actual revenues of €41.8 billion for FY

2000 including Media and Communications revenues of €13.6 billion and Environmental

Services revenues of €26.5 billion. The press release further stated:

> Vivendi Universal announced today that on a PRO FORMA basis
> for calendar 2000, the Company reported 7.2 billion euros in
> EBITDA (earnings before interest, taxes, depreciation and
> amortization) for the period ending December 31, 2000, up 48
> percent from 1999. Results reflect strong performance across the
> Company's business units – Media and Communications and
> Environmental Services. Actual EBITDA for the 12 months ended
> December 31, 2000, was 6 billion euros versus 4.3 billion euros in
> 1999.
>
> The PRO FORMA results were driven by growth in all business
> segments with the exception of Internet, in which development
> costs related to business expansion continued to have a negative
> impact on earnings. . . .
>
> Net income climbed 44 percent, before goodwill, to 2.8 billion
> euros or 4.4 percent basic shares up 19% and 60 percent, after
> goodwill, to 2.3 billion euros, from 1.4 billion euros. The Board of
> Directors of Vivendi Universal has recommended to the
> shareholders to approve an annual dividend of one euro per share,
> which will represent a high 47 percent pay-out ratio. . . .
>
> Jean-Marie Messier, Chairman and [CEO] of Vivendi Universal,
> stated: "The strong results that Vivendi Universal has generated
> for calendar 2000 provide a very solid foundation for the
> Company's growth prospects in 2001. *The robust performance of*
> *Vivendi Universal's business segments clearly reflects the fast*
> *pace and clear momentum that we have established as Vivendi*
> *Universal enters 2001.* The Company's unique combination of
> content and distribution assets paves the way for enormous growth
> opportunities. We have our management teams and plans in place
> as we moves [sic] to execute the growth strategies.    The
> management team, in particular, has been focused on the day-to-
> day operational performance and increased productivity of each of
> the Company's business units. I am very confident that, for Media
> and Communications, we will reach our revenue growth target of

43

> 10 percent and our aggressive EBITDA growth target of 35 percent
> for the period 2000-2002 and achieve superior returns for Vivendi
> Universal shareholders. . . . *Our businesses are strong, our
> management is focused and growth prospects are real and
> immediate.* " [emphasis added]

107. On March 12, 2001, as reported in *La Tribune,* Messier stated the Company had

exceeded expectations:

> Franco-Canadian media and communication group Vivendi
> Universal SA (VU) has announced its results for 2000, which were
> in line with forecasts, and has confirmed its objectives for 2001.
> Presenting his group's results for the year, VU chairman Jean-
> Marie Messier commented: *"When we merged, it was said that
> our aims were too ambitious. Well, we have exceeded them!"*
> [emphasis added]

108. The statements made by Defendants referenced in ¶¶ 105-107 above were each

materially false and misleading because, *inter alia*, Defendants were engaged in improper

accounting practices which had the effect of materially overstating Vivendi's reported earnings

and failed to disclose Vivendi's growing cash flow problems and lack of liquidity, including: (a)

improperly failing to disclose material commitments relating to its Cegetel and Maroc Telecom

subsidiaries which had they been disclosed would have raised concerns in the market about the

Company's liquidity and ability to access cash to meet its cash needs; (b) failing to disclose

important legal restrictions on its ability to unilaterally access cash flow of subsidiaries Cegetel

and Maroc Telecom; (c) overstating the Company's revenue from certain multi-year contracts;

(d) improperly manipulating reserves for bad debts in the Cegetel subsidiary; (e) improperly

failing to disclose other material off-balance sheet liabilities such the full extent of its interest in

Telco; and (f) improperly consolidating the financial results of Maroc Telecom into Vivendi's

own results. In addition, Defendants failed to disclose that Vivendi was suffering from a

growing liquidity crisis and that it would necessarily need to sell valuable assets and/or

restructure its debt obligations in order to remain solvent and avoid bankruptcy.

44

109.   On April 23, 2001, Vivendi issued a press release announcing "very strong" first

quarter 2001 results.  The press release announced that Media and Communications revenues

were up 10% to €5.9 billion, and Telecoms revenues were up 30% at €1.5 billion.  The press

release further reported that Media Communications EBITDA increased 112% to €900 million

and that Telecoms EBITDA more than tripled to €433 million.  The press release quoted Messier

as follows:

> "I am very pleased with Vivendi Universal's outstanding
> performance in our first quarter as a new company.  All our results
> meet or exceed our key operating targets.  *We created significant
> momentum by delivering solid first quarter 2001 results in
> EBITDA, which more than doubled, and by generating double
> digit revenue growth.*
>
> These results show the focus and dedication of all our management
> teams, in executing the unique promise of Vivendi Universal
> around its global strategy.  This is a great beginning.  With our
> momentum, our targets and the drive of our executive team, *I am
> extremely confident that, for Media and Communications, we
> will reach our annual EBITDA and revenue growth targets of
> 35% and 10%, respectively in 2001 and 2002 and achieve
> superior returns for Vivendi Universal shareholders. . . .*
>
> We are also ahead of targets for the synergies which indicate that
> the path of integration between our teams is great.  My only focus
> is and remains execution of this compelling media merger."
> [emphasis added.]

110.   On April 24, 2001, Messier addressed Vivendi's shareholders at the Company's

shareholders' meeting, the transcript of which was subsequently filed with the June 26, 2001

Form 6-K:

> *The foundations of our communications-related businesses are
> particularly healthy and strong.*  I would just like to emphasize a
> few points:
>
> - *a healthy balance sheet with total equity reaching 66 billion
>   Euro;*

- ***a pro forma net debt that is practically non-existent – around three billion Euro;***

- Vivendi Universal posted record-high net income, and has cash available for investing (participation in BskyB, etc.);

- Vivendi has rapidly growing revenue, which reach the double digits annually, spread out through all the European and American markets (60% and 40%); extraordinarily large customer bases, several dozen million subscribers; business models often based on subscription – meaning loyalty, recurrence, predictable revenues, and very little dependence on the advertising market.

Financially, Vivendi Universal, concerning the communications sectors, is rock solid – very stable with high growth. . . .

In my role as the chairman and as an employee of the company, I owe you the company's results. Here they are. They are good. . . . Vivendi Universal, our company, your company, is solid. Today, we are a leader, strong, dynamic, and profitable.  [emphasis added.]

111.    On May 18, 2001, Vivendi filed a Form 6-K with the SEC providing total revenue

information for first quarter of 2001.  This Form 6-K stated in part:

> ***Vivendi Universal revenue for first quarter of 2001 totaled 12.6 billion euros, a global 34.5% increase over the first quarter of the prior year.***    Vivendi Universal's media and communications businesses accounted for 5.9 billion euros and environmental services businesses accounted for 6.7 billion euros.  [Emphasis added.]

112.    The statements made by Defendants referenced in ¶¶ 109-111 above were each

materially false and misleading because, *inter alia*, Defendants were engaged in improper

accounting practices which had the effect of materially overstating Vivendi's reported earnings

and failed to disclose Vivendi's growing cash flow problems and lack of liquidity, including: (a)

improperly failing to disclose material commitments relating to its Cegetel and Maroc Telecom

subsidiaries which had they been disclosed would have raised concerns in the market about the

Company's liquidity and ability to access cash to meet its cash needs; (b) failing to disclose

important legal restrictions on its ability to unilaterally access cash flow of subsidiaries Cegetel
and Maroc Telecom; (c) overstating the Company's revenue from certain multi-year contracts;
(d) improperly manipulating reserves for bad debts in the Cegetel subsidiary; (e) improperly
failing to disclose other material off-balance sheet liabilities such as the full extent of its interest
in Telco; and (f) improperly consolidating the financial results of Maroc Telecom into Vivendi's
own results. In addition, Defendants failed to disclose that Vivendi was suffering from a
growing liquidity crisis and that it would necessarily need to sell valuable assets and/or
restructure its debt obligations in order to remain solvent and avoid bankruptcy.

113.    On June 1, 2001, Vivendi issued a press release announcing the acquisition of
Boston-based Houghton Mifflin Company. The release (issued in Paris and Boston) stated in
part that:

> Based on a total consideration of approximately $2.2 billion, which
> includes the assumption of Houghton Mifflin's average net debt of
> $500 million, the offer price represents 1.9 times 2001 estimated
> revenues of Houghton Mifflin, 7.7 times 2001 estimated EBITDA
> (earnings before interest, taxes, depreciation and amortization) and
> 10.7 times estimated EBITDA after book plate amortization.

114.    On July 2, 2001, Vivendi filed its 2000 20-F with the SEC, which was signed by
defendant Hannezo. The 2000 20-F contained Vivendi's "consolidated financial statements for
the years ended December 31, 2000, 1999 and 1998 and as at December 31, 2000 and 1999."

115.    The statements made by Defendants in the Company's 2000 20-F were false and
misleading because Defendants were engaged in improper accounting practices which had the
effect of materially overstating Vivendi's reported earnings and failed to disclose Vivendi's
growing cash flow problems and lack of liquidity, including: (a) improperly failing to disclose
material commitments relating to its Cegetel and Maroc Telecom subsidiaries which had they
been disclosed would have raised concerns in the market about the Company's liquidity and

47

ability to access cash to meet its cash needs; (b) failing to disclose important legal restrictions on its ability to unilaterally access cash flow of subsidiaries Cegetel and Maroc Telecom; (c) overstating the Company's revenue from certain multi-year contracts; (d) improperly manipulating reserves for bad debts in the Cegetel subsidiary; (e) improperly failing to disclose other material off-balance sheet liabilities such as the full extent of Vivendi's interest in Telco; and (f) improperly consolidating the financial results of Maroc Telecom into Vivendi's own results. In addition, Defendants failed to disclose that Vivendi was suffering from a growing liquidity crisis and that it would necessarily need to sell valuable assets and/or restructure its debt obligations in order to remain solvent and avoid bankruptcy.

## Vivendi's Misleading EBITDA Results For The Second And Third Quarters Of 2001

116.   Vivendi, at the direction of its senior executives, improperly adjusted certain reserve accounts of its subsidiaries and made other accounting entries without supporting documentation and not in conformity with U.S. GAAP in order to meet ambitious earnings targets. During the Relevant Time Period, Defendants referred to these improper efforts to meet or exceed earnings targets as "stretching."

117.   At the time of its December 2000 Merger with Seagram and Canal Plus, Vivendi and Messier predicted that the Company would generate annual EBITDA growth of 35% during 2001 and 2002. In order to assure that Vivendi would reach that target, during 2001, Vivendi improperly adjusted various reserve accounts and prematurely recognized income in a manner that was not in conformity with U.S. GAAP, including, in certain instances, SFAS No. 5 and Concepts Statement No. 5.

### (i)     Improper EBITDA Adjustments during the Second Quarter of 2001

118.     In late June 2001, Vivendi, Messier, Hannezo and other Vivendi executives became concerned that Vivendi's EBITDA growth for the quarter ended June 30, 2001 might not meet or exceed market expectations. As a result, Vivendi, at the direction of its senior executives, made various improper adjustments that raised Vivendi's EBITDA by almost €59 million, or 5% of the total EBITDA of €1.12 billion that Vivendi reported (excluding the results of the recently-acquired Maroc Telecom) for that quarter.

119.     Defendants increased Vivendi's EBITDA primarily by causing Cegetel, in the weeks leading up to Vivendi's earnings release for the second quarter of 2001, to depart from its historical methodology for determining the level of its reserve for bad debts (accounts receivable) during the second quarter of 2001. That departure resulted in Cegetel taking a lower provision for bad debts during that quarter than its historical methodology required. This improper departure caused Cegetel's bad debts reserve for the second quarter of 2001 to be €45 million less than it should have been. As a result, Vivendi's overall EBITDA for that period was increased by the same amount.

120.     During the Relevant Time Period, Cegetel's financial results were fully consolidated into Vivendi's financial statements, which at that time were prepared in accordance with French GAAP, but reconciled to U.S. GAAP. Under U.S. GAAP, SFAS No. 5 precludes the use of reserves, including excess reserves, for general or unknown business risks, and the systemic or timed release of reserves into income. Further, SFAS No. 5, paragraph 23, states that an estimate of losses on accounts receivable "normally depend[s] on, among other things, the experience of the enterprise... and appraisal of the receivables in light of the current economic environment."

121.    As Defendants knew or were reckless in not knowing, Cegetel reduced its

provision for bad debts during the second quarter of 2001 without the level of documentation and

analysis that was required.  Further, the decision to take a lower provision for bad debts in the

second quarter of 2001 occurred at a time when Cegetel was actually having more difficulty

collecting on its bad debts.

122.    In addition to taking a lesser bad debt provision in the second quarter of 2001,

Cegetel also, at the direction of Vivendi's senior executives, improperly deferred to the third

quarter of 2001 approximately €14 million in provisions for potential future payments and

potential liabilities that Cegetel properly should have booked in the second quarter of 2001.

Altogether, those adjustments at Cegetel totaled €59 million and enabled Vivendi to show overall

EBITDA growth of 35% for the second quarter of 2001.

123.    Those accounting adjustments at Cegetel were made without proper supporting

documentation and as a result, Vivendi's reconciled U.S. GAAP financial statements (which

incorporated Cegetel's results) were not in conformity with the requirements of SFAS No. 5.

**(ii)    Second Quarter 2001 Earnings Release**

124.    Vivendi issued a press release on July 23, 2001 boasting that it had achieved 35%

EBITDA growth for the second quarter of 2001.  In highlighting this achievement, Messier told

the market, "I can only re-emphasize our confidence.  We will at least meet our stated targets."

The press release further claimed that, in just the first half of the year, Vivendi had already

achieved 75% of its incremental EBITDA target for 2001.  The press release also represented

that, except for Canal Plus and certain publishing operations, the results contained in the press

release were "U.S. GAAP based."

125.    Vivendi's press release further reported Media and Communications revenues

were up 16% (excluding Universal Studios Group) to €6.6 billion, and EBITDA grew 57% to

€1.3 billion. Concerning Vivendi's first half 2001 results for Media and Communications

businesses, the press release stated in part:

> In the course of the first half of 2001, Vivendi Universal achieved
> three quarters of its full-year target of incremental EBITDA
> (nearly 800 million euros excluding Maroc Telecom, relative to the
> company's target of slightly more than 1 billion euros).
>
> In the first half of 2001, revenues increased to 12.4 billion euros
> (up 15% [excluding USG]), and EBITDA grew to 2.2 billion euros
> (up 77% over 2000 comparable period).

126. Messier commented on the results, stating in part as follows:

> The results produced by Vivendi Universal in the second quarter
> are well ahead of market consensus.... They confirm the
> robustness of our businesses, with limited exposure to advertising;
> the benefits of a truly global position; and the fast progress of the
> reorganization and implementation of our recent merger.
>
> With three quarters of the 'aggressive' incremental EBITDA target
> for the full year 2001 [1.12 billion euros of incremental EBITDA,
> or 35% over the pro forma 2000 guidance provided last October
> and slightly above 1 billion euros of incremental EBITDA over the
> final 2000 results] already achieved in the first half of the year, I
> can only re-emphasize our confidence. We will at least meet our
> stated targets.
>
> ***Obviously, our current stock price does not fully reflect this
> situation in terms of EBITDA multiples or Enterprise Value to
> EBITDA to growth. With the highest growth rates of the
> industry and the lowest multiples, our stock is definitely an
> attractive investment today.***
>
> The first half has been a period of total operational focus in each of
> our businesses, while completing significant achievements in the
> implementation of the merger, reorganization and execution of our
> strategy. [Emphasis added.]

127. As a result of the various improper adjustments made to Cegetel's reserve

accounts in the second quarter of 2001, these representations in Vivendi's press release were

misleading.

51

128.    Vivendi also made false claims in this press release about the increase in the

performance of its "Telecoms," including Cegetel, over the second quarter of 2000, when in

reality over 8% of the Telecoms' EBITDA came from the improper adjustments of Cegetel's

accounting reserves in violation of SFAS No. 5.

129.    Following the July 23, 2001 press release, Vivendi hosted a conference call to

discuss the second quarter 2001 results and the Company's business and prospects.  During the

call, Messier and others in Vivendi management stated:

- Vivendi was able to achieve strong results even in a down
  market and was in fact gaining market share.

- The Company was still on track to achieve strong growth in
  revenues and earnings in 2001, including EBITDA growth of
  35%.

130.    On July 23, 2001, Vivendi common stock increased in price to €63.1 and the price

of Vivendi ADSs rose from $52.39 per share to $55.00 per share, representing a 5% increase.

131.    The market reacted favorably to Vivendi's July 23, 2001 press release.  For

example, analysts observed that Vivendi had beaten the expectations and results of its main

competitors in the media industry.  One analyst noted that Vivendi's results were a "pleasant

surprise," while another news report specifically noted that the results of Cegetel and Vivendi's

other telecommunications businesses "defied . . . the Telecommunications meltdown."  In an

analyst's report dated July 23, 2001, Robertson Stephens, Inc. ("Robertson Stephens") issued a

"Buy" rating stating:  "We expect the company to perform well through a sluggish economy and

to emerge strategically well-positioned."  Similarly, Merrill Lynch Capital Markets ("Merrill

Lynch") issued a "Buy" rating in an analyst report dated July 26, 2001, stating in pertinent part

as follows:

> Outperformance was across virtually all divisions particularly
> Film, Telecoms and Music.

52

As a result, we are upgrading our 2001 OCF a second time by 2%.
. . .

Company re-confirmed its targets for 2001. In a down music market, Universal is gaining share and is confident of double digit EBITDA growth.

132.    The statements made by Defendants referenced in ¶¶ 124-129 above were each materially false and misleading because, *inter alia*, Defendants were engaged in improper accounting practices which had the effect of materially overstating Vivendi's reported earnings and failed to disclose Vivendi's growing cash flow problems and lack of liquidity, including: (a) improperly failing to disclose material commitments relating to its Cegetel and Maroc Telecom subsidiaries which had they been disclosed would have raised concerns in the market about the Company's liquidity and ability to access cash to meet its cash needs; (b) failing to disclose important legal restrictions on its ability to unilaterally access cash flow of subsidiaries Cegetel and Maroc Telecom; (c) overstating the Company's revenue from certain multi-year contracts; (d) improperly manipulating reserves for bad debts in the Cegetel subsidiary; (e) improperly failing to disclose other material off-balance sheet liabilities such as the full extent of its interest in Telco; and (f) improperly consolidating the financial results of Maroc Telecom into Vivendi's own results. In addition, Defendants failed to disclose that Vivendi was suffering from a growing liquidity crisis and that it would necessarily need to sell valuable assets and/or restructure its debt obligations in order to remain solvent and avoid bankruptcy.

**(iii)    Improper Adjustments of UMG's EBITDA during the Third Quarter of 2001**

133.    In early September 2001, as rumors circulated that Vivendi's earnings would be disappointing, Vivendi's ADSs declined from the mid-$50s to the mid-$40s per share, and its ordinary shares declined from the mid-€50s to the mid-€40s. In response, Defendants categorically denied any problems. Vivendi, after the market closed on September 5, 2001,

53

reiterated its targets for 2001 and 2002. Messier stated in an interview with *Reuters* that evening,

that "[n]o profit warning of any kind needs to be feared coming from Vivendi Universal."

134.     On September 25, 2001, Vivendi issued a press release announcing "Strong First

Half 2001" results and a "Solid Outlook for 2002." The press release reported that revenues

increased 11% to €26.4 billion, that EBITDA grew 42% to nearly €4 billion, that operating

income grew 65% to €1.9 billion, and that net income, before goodwill amortization, reached

€1.1 billion or €0.97 per share. With respect to Media and Communication, the release reported

that first half 2001 revenues reached €12.4 billion, up 15%, EBITDA reached €2.2 billion euros,

up 77%, and that operating income nearly tripled to €946 million, up 184%. Concerning

Vivendi's environment business, the release reported that revenues were up 11% to €13.9 billion,

that EBITDA was up 12% to €1.76 billion, and that operating income was up 13% to €0.97

billion. Commenting on these results, the press release further quoted Messier as follows:

> ***Despite the current environment, we will reach all our previously
> stated revenue/EBITDA objectives for the 2001 year.*** I continue
> to express my confidence in achieving our more than 10% revenue
> growth targets for 2001 and our more than 35% EBITDA growth
> (versus the company's October 2000 guidance) at a constant asset
> base. This, combined with some extensions in the company's asset
> base (i.e., Maroc Telecom and Houghton Mifflin), should result in
> full-year Media and Communications EBITDA slightly north of 5
> billion euros. In the current environment, giving a 2002 target
> would not be meaningful, and we have yet to complete our 2002
> budget and plan process. Before the recent tragedy [of September
> 11], market consensus for 2002 EBITDA was not far from 6 billion
> euros. Despite the events, looking at the trends of our businesses
> and our defensive qualities, we are currently very comfortable [sic]
> with this expectation. [Emphasis added; footnote omitted.]

135.     Various improper adjustments to Vivendi's EBITDA also occurred in the third

quarter of 2001, and primarily affected the results of its music division, UMG. These improper

adjustments increased UMG's reported results for the quarter ended September 30, 2001 by at

least €10.125 million, or approximately 4% of UMG's total EBITDA of €250 million for that quarter.

136.    Vivendi improperly increased UMG's results in order to reach a pre-determined EBITDA figure at UMG for the quarter ended September 30, 2001 of €250 million. At that level, UMG would have been able to show EBITDA growth of approximately 6% versus the same period in 2000, and to outperform its rivals in the music business.

137.    At least two improper adjustments were made to UMG's reported results in order to reach an EBITDA figure of €250 million. First, UMG prematurely recognized just over €3 million in deferred revenue that it received in connection with a contract between UMG and other parties. During the quarter ended September 30, 2001, UMG had deferred recognizing the €3 million payment it received on the basis that this payment would need to be refunded if Vivendi and the other parties to the contract failed to meet certain conditions by mid-December 2001. The recognition of this €3 million payment as income in the third quarter of 2001 was not in conformity with U.S. GAAP because those conditions were not met during the third quarter, and the payment remained refundable.

138.    Second, in late October 2001, Vivendi temporarily reduced the amount of corporate overhead charges it allocated to UMG by €7 million. This reduction in the corporate overhead charges equaled the exact amount of additional earnings that Vivendi's senior executives determined that UMG would need in order to reach €250 million in EBITDA for the quarter ended September 30, 2001.

139.    This overhead allocation was not in conformity with U.S. GAAP. Concepts Statement No. 6 states that allocations are assigned and distributed "according to a plan or a formula." Further, SFAS No. 131 provides that amounts allocated to reported segment profit or

loss "shall be allocated on a reasonable basis." During the third quarter of 2001, Defendants based the overhead allocation charged to UMG not on a plan or formula, but primarily on a desire to reach a specific EBITDA target. This conduct was not in conformity with either Concepts Statement No. 6 or SFAS No. 131.

140.    Both the corporate overhead adjustment and the premature recognition of the contract revenue occurred after UMG had submitted its accounts to Vivendi for the quarter. Moreover, these accounting adjustments to UMG's EBITDA were made without proper documentation and were not in conformity with U.S. GAAP. Defendants caused Vivendi's results to not be in conformity with U.S. GAAP, and incorporated these inflated results into Vivendi's earnings releases. These practices caused Vivendi's financial reports, press releases, and other market communications to be materially false and misleading.

(iv)    **Third Quarter 2001 Earnings Release**

141.    On October 30, 2001, Vivendi announced in its third quarter 2001 earnings press release, approved by Messier, Hannezo and other senior executives, that UMG had achieved €250 million in EBITDA for the quarter, and 6% EBITDA growth versus the same quarter in 2000. Vivendi touted these results and noted that UMG was able to show growth at a time when its major competitors in the music industry had seen a decrease in earnings. The press release also represented that, except for Canal Plus, the results contained in the press release were presented on a "U.S. GAAP basis."

142.    Because of the improper increases to UMG's EBITDA by, among other things, the premature recognition of deferred income and the reduction of overheard charges for the purpose of meeting Vivendi's target, Vivendi's statements and omissions created the false and misleading impression that UMG's EBITDA in particular, and Vivendi's overall EBITDA, were

56

stronger than they really were.  Further, Vivendi's representation that the results for UMG

contained in the press release were presented on a "U.S. GAAP basis" was also false.

      143.    The release announced that Media and Communications revenues were up 24% to

€7.3 billion, and that EBITDA was up 90% to €1.5 billion.  The release further reported that

Telecom's revenues increased by 17% to €2.1 billion, and EBITDA grew by 31% versus *pro*

*forma* results for the third quarter of 2000.  The release also stated in pertinent part:

> - On a pro forma basis, third quarter revenue growth was 8%,
>   and EBITDA growth was 30%.  Year-to-date revenues
>   increased 9%, and EBITDA increased 46%.
>
> - Company reaffirms confidence in achieving its growth targets:
>   10% revenue growth and 35% organic EBITDA growth in
>   2001

> **"Our third quarter results for the media and communications
> businesses, with 24% revenue and 90% EBITDA growth,
> including organic growth of 8% and 36% respectively, are
> obviously strong despite the tough environment," said Jean-
> Marie Messier, Chairman and Chief Executive Officer of
> Vivendi Universal.  "They reflect both our higher potential for
> growth and greater resiliency to recessionary environments
> compared to many of our peers. . .**

> "Additionally, Vivendi Universal's media and communications
> businesses are presently less vulnerable to recessionary
> environments than many of our peers because of our strong
> defensive qualities . . . .   Having the highest resiliency and lowest
> sensitivity to a recessionary environment explains our ability to
> outperform most of our peers. . . .

> "An early look at the fourth quarter indicates that we are on track
> to meet our targets.  *I continue to express my confidence in
> achieving 10% revenue growth and 35% EBITDA growth in
> 2001 at a constant asset base.*   This, combined with some
> expansions in the company's asset base (i.e. Maroc Telecom and
> Houghton Mifflin), should result in full-year Media and
> Communications EBITDA slightly above 5 billion euros.
> [Emphasis added; footnotes omitted]

144.    Following the October 30, 2001 Press Release, Vivendi hosted a conference call

to discuss the third quarter 2001 results and the Company's business and prospects. During the

call, Messier and others in Vivendi management stated:

> Vivendi was able to achieve strong results even in a down market
> and was in fact gaining market share.
>
> The Company was still on track to achieve strong growth in
> revenues and earnings in 2001.

145.    Based on Defendants' statements, including those made during the conference

call, securities analysts that followed Vivendi securities reacted positively to the Company's

reported financial results. For example, on October 31, 2001, Morgan Stanley Dean Witter

("Morgan Stanley") issued an "OutPerform" rating, stating:

> We continue to accord Vivendi Universal an OutPerform rating
> with a €62 twelve-month price target. Our investment thesis is
> based on VU's valuation, lack of sensitivity to economic recession,
> and diversity of revenue sources. In a quarter in which all its peers
> were forced to revise their 2001 and 2002 outlooks downward to
> reflect continued US economic weakness exacerbated by the
> events of Sept 11, Vivendi Universal outperformed expectations
> and reiterated its full year guidance. The divergence between VU
> and its peers reflects the company's high level of financial
> predictability, a direct function of owning a number of
> internationally diversified, market share-leading businesses that
> have a low dependence on advertising.

146.    The statements made by Defendants referenced in ¶¶ 133-134, 141-144 above

were each materially false and misleading because, *inter alia*, Defendants were engaged in

improper accounting practices which had the effect of materially overstating Vivendi's reported

earnings and failed to disclose Vivendi's growing cash flow problems and lack of liquidity,

including: (a) improperly failing to disclose material commitments relating to its Cegetel and

Maroc Telecom subsidiaries which had they been disclosed would have raised concerns in the

market about the Company's liquidity and ability to access cash to meet its cash needs; (b)

58

failing to disclose important legal restrictions on its ability to unilaterally access cash flow of

subsidiaries Cegetel and Maroc Telecom; (c) making improper accounting adjustments to falsely

increase UMG's EBITDA; (d) overstating the Company's revenue from certain multi-year

contracts; (e) improperly manipulating reserves for bad debts in the Cegetel subsidiary; (f)

improperly failing to disclose other material off-balance sheet liabilities such as the full extent of

its interest in Telco; and (g) improperly consolidating the financial results of Maroc Telecom into

Vivendi's own results.  In addition, Defendants failed to disclose that Vivendi was suffering

from a growing liquidity crisis and that it would necessarily need to sell valuable assets and/or

restructure its debt obligations in order to remain solvent and avoid bankruptcy.

## **DECEMBER 2001 – THE FRAUD WORSENS**

147.    On December 6, 2001, Vivendi issued a press release announcing Edgar

Bronfman's decision to resign from his position as Executive Vice Chairman.  Commenting on

Bronfman's resignation, Messier assured the investing public that Vivendi "is in a very strong

position, with solid performance in virtually every business."  Messier's statements contained

untrue statements of material fact and omitted to state material facts required therein or necessary

to make the statements therein not misleading because he failed to disclose that Vivendi was not

in a "very strong position" but, rather, was in a precarious financial position as a result of the

accounting improprieties previously discussed above and was suffering from a liquidity crisis, as

also discussed in further detail below.  Further, these statements contained untrue statements of

material fact and omitted to state material facts required therein or necessary to make the

statements therein not misleading because Messier failed to disclose that Vivendi's purportedly

"solid performance" was attributable to those accounting improprieties and to Defendants' active

concealment of the liquidity crisis the Company was facing.

148.    One week later – after announcing that it would raise $2.5 billion by selling a $1.5 billion interest in BskyB and a $1.06 billion interest in Vivendi Environnement – Vivendi stated, as reported by the *Financial Times (London)* on December 14, 2001, that these asset sales would give Vivendi "room to manoeuvre" for additional acquisitions, and enable it "to cover any eventual needs from different opportunities for strategic partnerships."

149.    In December 2001, Vivendi held a series of critical meetings with analysts from Moody's Investors Services ("Moody's") and Standard & Poor's, companies that publish independent credit opinions, research and commentary to assist investors in analyzing the credit risks associated with fixed-income securities. The meetings with the analysts preceded Vivendi's December 17, 2001 announcement that it would spend almost $12 billion to acquire portions of USA Networks, Inc. ("USA Networks") and Echostar Communications ("Echostar"). Because these transactions required Vivendi to spend a large amount of cash and assume additional debt, Vivendi sought "pre-clearance" from Moody's and Standard & Poor's that the transactions, when announced, would not result in a downgrade of Vivendi's credit rating.

150.    During these meetings and in other public statements Defendants failed to disclose future commitments regarding Cegetel and Maroc Telecom that, had Vivendi made the required disclosures, would have raised concerns in the market about the company's ability to meet its cash needs. Vivendi also failed to disclose these commitments in its SEC filings on Forms 20-F for the fiscal years ended 2000 and 2001.

151.    Moody's and Standard & Poor's based their rating of Vivendi's credit primarily on the company's debt-to-EBITDA ratio. At the time of the December 2001 meetings, both Moody's and Standard & Poor's told Vivendi that its debt-to-EBITDA ratio was too high for it to maintain its investment-grade status. However, both credit rating agencies also told Vivendi that

they would not downgrade its credit rating if Vivendi committed to taking certain debt reduction measures in 2002. Senior officers of Vivendi assured Moody's and Standard & Poor's that Vivendi would reduce its debt by several billion dollars during 2002.

152.    As a result of these assurances, neither Moody's nor Standard & Poor's downgraded Vivendi after it announced the USA Networks and Echostar transactions. However, Vivendi had not informed Moody's or Standard & Poor's about certain undisclosed commitments that existed at the time of these transactions.

153.    These commitments, if disclosed, would have alerted the public to Vivendi's future cash requirements and would have raised concerns in the market about Vivendi's ability to meet its cash needs. There were three principal undisclosed commitments:

- The Cegetel current account;
- The Maroc Telecom side agreement; and
- The Telco transaction.

### (i)    The Cegetel Current Account

154.    In the summer of 2001, Vivendi, at the direction of Messier, Hannezo and other senior executives, entered into an undisclosed current account with Cegetel, its most profitable and cash-flow positive subsidiary. Pursuant to this current account, which operated much like a loan, Cegetel delivered excess cash to Vivendi on a short-term basis, beginning in August 2001. In return, Vivendi paid Cegetel a market rate of interest, and agreed to return the funds at the expiration of the current account agreement, which at first was December 31, 2001 and was then extended to July 31, 2002.

155.    Although Vivendi maintained cash-pooling arrangements with most of its subsidiaries, the funds that it received from Cegetel were on different terms than these other pooling arrangements. Notably, the current account with Cegetel contained a specific expiration

61

date. Additionally, the Cegetel current account documents contained an "on demand" clause pursuant to which Cegetel could demand immediate reimbursement of the funds that it deposited with Vivendi at any time.

156.    Pursuant to the current account agreement, Cegetel delivered approximately €520 million to Vivendi in August 2001. Between September 2001 and June 2002, the account balance continued to grow, and at various times exceeded €1 billion. Vivendi used this money to pay for ordinary operating expenses.

157.    Even though the Cegetel current account, and the possibility that Vivendi would have to repay it at any time and certainly no later than July 31, 2002, had a direct impact on Vivendi's liquidity condition, Vivendi did not disclose the existence of the Cegetel current account in the liquidity section of its Form 20-F for the fiscal year ended December 31, 2001, which was filed with the Commission on May 28, 2002. Various Commission rules and regulations required disclosure of the Cegetel current account in Vivendi's Form 20-F. For example, Item 303 of Commission Regulation S-K requires issuers to identify any known "demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." Moreover, Item 5(B)(1)(b) of the instructions to Form 20-F requires issuers to disclose "restrictions on the ability of subsidiaries to transfer funds to the company in the form of cash dividends, loans or advances and the impact such restrictions have had or are expected to have on the ability of the company to meet its cash obligations." Vivendi failed to adhere to either of these requirements in connection with its Form 20-F for the fiscal year ended December 31, 2001.

158.    In mid-June 2002, Cegetel's other shareholders demanded repayment of the current account from Vivendi. In order to repay Cegetel, Vivendi had to use proceeds from a