recently completed asset sale, which Vivendi stated both in its June 26, 2002 press release and in meetings with Moody's and Standard & Poor's would be used to reduce Vivendi's debt. Indeed, despite including a list of purported upcoming expenditures in its June 26, 2002 press release, Defendants failed to disclose the existence of the Cegetel current account or the demand for its repayment.

      **(ii)**      **Failure to Disclose the Maroc Telecom Side Agreement**

      159.      During 2001 and early 2002, Defendants, along with other senior executives of Vivendi, also failed to disclose a side agreement that Vivendi entered into in February 2001 to purchase an additional €1.1 billion stake in Maroc Telecom, a telecommunications operator of fixed line and mobile telephony and Internet services based in Morocco.

      160.      In December 2000, the Moroccan government sponsored an auction of 35% of the state-owned Maroc Telecom. Vivendi won the auction with a bid of €2.35 billion. Under the terms of the auction, the Moroccan government, which would retain a 65% stake in Maroc Telecom, required Vivendi to execute a shareholder agreement that would maintain the Moroccan government's control over Maroc Telecom's operations. The terms of that shareholder agreement precluded Vivendi from consolidating Maroc Telecom's results.

      161.      Defendants, however, wanted to gain control of Maroc Telecom and consolidate its results because Maroc Telecom carried little debt and generated substantial EBITDA. By consolidating Maroc Telecom, Defendants hoped to increase Vivendi's EBITDA performance and, more importantly, improve the debt/EBITDA ratio used by Moody's and Standard & Poor's to evaluate Vivendi's credit.

      162.      In February 2001, Vivendi and the Moroccan government entered into a side agreement that required Vivendi to purchase an additional 16% of Maroc Telecom's shares in February 2002 for approximately €1.1 billion. In return, the Moroccan government granted

Vivendi certain management rights over the operations of Maroc Telecom upon which Vivendi based its consolidation of Maroc Telecom.

163.    Even though Defendants knew of the existence and terms of the side agreement, they failed to disclose that Vivendi had committed to purchasing an additional 16% stake in Maroc Telecom by February 2002 for €1.1 billion, contingent upon the Moroccan government's exercise of the irrevocable put. Vivendi failed to disclose these facts in its public filings with the Commission, the COB, and in other public statements that it made in 2001 and early 2002.

164.    For example, on July 2, 2001, Vivendi filed its 2000 20-F, approved by Messier and other senior executives, and signed by Hannezo, which disclosed the following about Maroc Telecom:

### PURCHASE OF INTEREST IN MAROC TELECOM

In December 2000, we announced that we had acquired a 35% stake in Moroccan telecommunications operator Maroc Telecom for approximately €2.3 billion. Maroc Telecom, which operates fixed-line and mobile telephone networks in Morocco, is estimated to have generated revenue of approximately €1.3 billion in 2000. In cooperation with Maroc Telecom, we intend to contribute our telecoms experience to the modernization of the telecommunications industry in Morocco.

165.    By omitting to disclose the Maroc Telecom side agreement, and in particular, Vivendi's commitment to pay an additional €1.1 billion in February 2002 for additional shares of Maroc Telecom, Vivendi's 2000 20-F was materially false and misleading.

166.    Vivendi also failed to disclose its commitment with respect to Maroc Telecom in its periodic filing with the COB for the six-month period ended June 30, 2001. On October 17, 2001, Vivendi furnished an English translation of that filing to the Commission on Form 6-K. The COB filing and Vivendi's Form 6-K were reviewed and approved by Messier, Hannezo and other senior executives.

64

167.     Vivendi also failed to disclose the Maroc Telecom side agreement to analysts at Moody's and Standard & Poor's during the December 2001 "pre-clearance" meetings regarding the USA Networks and Echostar transactions.  Vivendi's senior executives knew that if Vivendi had disclosed this obligation to pay the Maroc Telecom put, the credit rating agencies may have declined to maintain their credit rating of Vivendi.

168.     In February 2002, Vivendi and the Moroccan government agreed to extend the deadline for the side agreement to September 2005.  Vivendi finally disclosed the existence of the renegotiated side agreement in its 2001 20-F, filed on May 28, 2002.

### (iii)     The Telco Transaction

169.     Defendants also failed to disclose in a timely manner all material facts concerning Vivendi's investment in a fund that purchased a 2% stake in Telco, a Polish telecommunications holding company.

170.     In June 2001, Vivendi, which owned 49% of Telco's equity, publicly announced its intention to purchase an additional 2% of Telco's shares from Vivendi's partner in the Telco joint venture.  This purchase would have increased Vivendi's ownership of Telco equity from 49% to 51%.  Vivendi anticipated that it would have to pay approximately €100 million for the additional Telco shares.

171.     After this announcement, Vivendi learned that Poland's antitrust authorities would have to approve the acquisition, a process that could have taken several months.  Vivendi also learned that the market in general, and the credit rating agencies in particular, might react negatively to Vivendi's acquisition of additional Telco shares.  As a result, rather than directly purchasing the 2% interest in Telco, Vivendi deposited $100 million into an investment fund administered by Société Générale Bank & Trust Luxembourg.  That fund subsequently purchased a 2% stake in Telco in September 2001, and continues to own those shares.

172.     Vivendi did not disclose all material details about this transaction until 2003.

Instead, Vivendi's 2001 20-F, filed with the Commission on May 28, 2002, states only the

following concerning Vivendi's interest in Telco:

> Participation in Elektrim — In September 2001, Elektrim
> Telekomunikacja (Telco), in which Vivendi Universal has a 49%
> interest, acquired all of Elektrim S.A.'s landline
> telecommunications and Internet assets.

173.     Vivendi's statements and omissions concerning Telco in its 2001 20-F created the

false and misleading impression that Vivendi maintained no more than a 49% financial interest

in Telco, whether directly or indirectly, even though it had invested in a fund that purchased a

2% stake in Telco.  Defendants knew, or were reckless in not knowing, that that disclosure was

inadequate and misleading.

174.     On December 17, 2001, Vivendi issued a press release announcing the acquisition

of USA Networks for $10.3 billion.  Commenting on the acquisition, Messier stated in pertinent

part as follows:

> Our strategy is clearly coming together.  Combining within the
> same operational entity, VUE, USG and the entertainment assets of
> USA creates a new U.S. major, which will benefit from the full
> integration of TV and movies activities with production and
> distribution.

> \* \* \*

> *In addition, this strategic move will significantly benefit Vivendi*
> *Universal shareholders, because of its significant value-accretion*
> *at every level – EBITDA, net income and free cash flow.*  By
> using mainly non-core, consolidated assets to acquire this control,
> we are strongly positioned to enhance performance and value to
> Vivendi Universal shareholders.

> \* \* \*

66

> At the end of just one year following our merger with Seagram and Canal Plus, we have put the pieces together in fulfilling our strategy. In one short year, we have focused on integration and addressing our relative distribution weakness in the U.S. – and here we are today. We expect that 2002 will be a year of growth, without further change in perimeter.

175.   On December 17, 2001, Messier held a press conference with Barry Diller,

Chairman and CEO of USA Networks, from the St. Regis Hotel in New York City to discuss the

acquisition of USA Networks, the creation of Vivendi Universal Entertainment ("VUE") and

Vivendi's prospects for 2002:

> *At the end of the day, this transaction is not putting pressure on Vivendi Universal. On the reverse, what it allows us to do is to increase our [EBITDA] target for 2002 by more than ten percent. It's to increase our net income in 2002 by roughly 200 million dollars. It's to increase the net free cash flow of the group in 2002 by, let's say, three hundred and fifty million dollars. At every level of the [P&L] and of the cash flow that you may look at, this transaction is very positive to VUE shareholders year one.*
>
> * * *
>
> As far as the global [debt] ratio of the group is concerned, *our target is to have in '02 a [debt] to [EBITDA] ratio well below three times and especially we are focusing to reach that target ahead of the end of the first half of 2002,* which means that Vivendi Universal will end up its program of selling its non core asset in the first half of '02; it will give us very comfortable triple B credit rating targets that we are very comfortable with. . . . *So, no cleaning of balance sheet because the balance sheet is clean. . . .* [W]e are committed to issue full US [GAAP] earnings starting Q1 of '02. We already, in fact, worked on the basis of US [GAAP] accounting methods in '01 in order to build our track record at the time of this year, at the time of the release of our first full quarterly U.S. [GAAP] in '02. *So we are already applying all US [GAAP] methodologies, including those relating to amortization.* [Emphasis added.]

176.   The statements made by Defendants referenced in ¶¶ 174-175 above were each

materially false and misleading because, *inter alia*, Defendants were engaged in improper

accounting practices which had the effect of materially overstating Vivendi's reported earnings and failed to disclose Vivendi's growing cash flow problems and lack of liquidity, including: (a) improperly failing to disclose material commitments relating to its Cegetel and Maroc Telecom subsidiaries which, had they been disclosed, would have raised concerns in the market about the Company's liquidity and ability to access cash to meet its cash needs; (b) failing to disclose important legal restrictions on its ability to unilaterally access the cash flow of subsidiaries Cegetel and Maroc Telecom; (c) overstating the Company's revenue from certain multi-year contracts; (d) improperly manipulating reserves for bad debts in the Cegetel subsidiary; (e) improperly failing to disclose other material off-balance sheet liabilities such as the full extent of its interest in Telco; and (f) improperly consolidating the financial results of Maroc Telecom into Vivendi's own results. In addition, Defendants failed to disclose that Vivendi was suffering from a growing liquidity crisis and that it would necessarily need to sell valuable assets and/or restructure its debt obligations in order to remain solvent and avoid bankruptcy.

177. In a January 7, 2002 press release, Vivendi announced that it had mandated Deutsche Bank AG and Goldman, Sachs & Co. to sell 55 million treasury shares - about half of the shares Vivendi had bought back just months earlier. The approximately €3.3 billion ($3 billion) in proceeds, the Company stated, were to be used "mostly to reduce the company's debt."

178. The sale, coming so closely on the heels of Vivendi's massive shares buy-back program, raised concerns in the market that Vivendi had liquidity problems. Although the offering price of €60 a share was a 4% discount from the previous day's close, the underwriters failed to sell all of the stock, and were required to take "investment positions" in the Company (i.e. keep the shares they were unable to sell). The market price for Vivendi securities fell

significantly.  On January 8, Vivendi shares traded for €59.20 each.  By January 30, the share

price had dropped to €51.10, with a volume of 15 million shares.  The decline continued and, by

February 5, Vivendi shares traded for €46.00 each, down 27% from the beginning of the year.

179.    The true scope of Vivendi's liquidity problems, however, was not fully revealed

until months later.  Instead, as detailed below at ¶¶ 180-249 and 272-310 and elsewhere,

Defendants falsely denied that there was any reason for concern and made affirmative

misstatements to the market to attempt to prop up Vivendi's gradually declining share price.

180.    On February 6, 2002, *AFX News Limited* reported that in an attempt to dispel

concern about the Company's debt levels and accounting practices, a letter was distributed to the

Company's employees stating that no profit warnings were forthcoming:

> Vivendi Universal CEO Jean-Marie Messier said the media
> company will not make any change in its guidance for 2001
> earnings due for release on March 5, although the fourth quarter
> was a difficult period.
>
> Messier made the comment in a letter to Vivendi's staff,
> addressing the recent volatility and losses in the company's share
> price.
>
> "Some global markets, including the music market, declined
> during this period.  But despite the difficulties, *we are the only
> media company not to have issued a profit warning on its
> operating results and there's no change to that situation,"* said
> Messier.
>
> * * *
>
> *"There are no hidden risks and no speculative instruments,"* he
> said.  [Emphasis added.]

181.    The February 6, 2002 email posted on the Company's web site for employees

made the following statement:

Vivendi Universal's share has come under strong attack during recent weeks, and it has fallen heavily since the beginning of the year as it did in September 1999 and September 2001.

With our 2001 financial statements due out on March 5, we are in the "forbidden" period during which we cannot communicate our figures in public, and we will adhere to that rule.

It is important to let you know the situation of our company as many of you are employee-shareholders.

- Are there any (bad) surprises hiding in our 2001 financial results?
  No...

- Is there any major uncertainty about our level of debt?
  No...

- Are there any hidden off-balance sheet transactions that could cause any particular fears or risks?
  No...

182.    On February 11, 2002, Vivendi issued a press release announcing its year-end

2001 Media and Communications results. Vivendi announced Media and Communications

"proforma revenue growth of 9% for the year ended December 31, 2001, reaching 28.9 billion

euros." The release further reported that Vivendi's Telecoms segment achieved 24% revenue

growth in 2001, and that *"[r]evenue growth was 10% using the 2000 perimeter excluding*

*Universal Film, exactly in line with management estimates given 12 months ago."* [Emphasis

added.]

183.    Commenting on the results, Messier stated:

> *I am pleased that we achieved our ambitious target of 10%*
> *organic revenue growth in 2001, for the businesses resulting*
> *from Vivendi's merger with Seagram and Canal Plus.* Organic
> growth is, more than ever in today's markets, the most important
> strength of Vivendi Universal. Achieving the highest level of
> growth in our industry is a big differentiation of Vivendi
> Universal, and the operating management deserves recognition for
> fulfilling their growth objectives and outperforming their peers in a

70

> difficult year. Our 2001 results give us confidence that we can achieve our growth targets again in 2002. [Emphasis added.]

184.    On February 12, 2002, in response to the Company's early release of positive

results, *The New York Times* reported:

> "Vivendi is one of the few companies in the global media sector which has not issued a revenue or Ebitda warning," said Mark Harrington of J.P. Morgan, referring to a common measure of gross operating profit. "So it demonstrates the structural growth of the company relative to its global media peers," he said of today's report.

185.    On March 3, 2002, Messier was quoted in the *Financial Times* as stating that

"Vivendi had only two significant off-balance sheet structures, one relating to shares it is selling

in BSkyB and another relating to four buildings: 'There are no hidden risks and no speculative

instruments.'"

186.    The statements made in ¶¶ 180-183, and 185 above were false and misleading

because Defendants were engaged in improper accounting practices which had the effect of

materially overstating Vivendi's reported earnings and failed to disclose Vivendi's growing cash

flow problems and lack of liquidity, including: (a) improperly failing to disclose material

commitments relating to its Cegetel and Maroc Telecom subsidiaries which had they been

disclosed would have raised concerns in the market about the Company's liquidity and ability to

access cash to meet its cash needs; (b) failing to disclose important legal restrictions on its ability

to unilaterally access the cash flow of subsidiaries Cegetel and Maroc Telecom; (c) overstating

the Company's revenue from certain multi-year contracts; (d) improperly manipulating reserves

for bad debts in the Cegetel subsidiary; (e) improperly failing to disclose other material off-

balance sheet liabilities such as the full extent of its interest in Telco and (f) improperly

consolidating the financial results of Maroc Telecom into Vivendi's own results. In addition,

Defendants failed to disclose that Vivendi was suffering from a growing liquidity crisis and that

71

it would necessarily need to sell valuable assets and/or restructure its debt obligations in order to remain solvent and avoid bankruptcy.

**Vivendi's Misleading FY2001 Earnings Release And Other False Press Releases**

**(i)      March 5, 2002 Earnings Release for 2001 Fiscal Year**

187.    On March 5, 2002, Vivendi issued its earnings release for the 2001 fiscal year, approved by Messier, Hannezo and other senior executives, in which Vivendi announced that its Media & Communications business had produced €5.03 billion in EBITDA and just over €2 billion in Operating Free Cash Flow. In its March 5, 2002 earnings press release, Vivendi stated that both of these results were well ahead of EBITDA projections and that the cash flow figure in particular was well ahead of the company's own internal targets. The March 5, 2002 press release also emphasized "the excellent operating results that have been achieved" and stated that the results "confirm the strength of Vivendi Universal's businesses across the board despite a very difficult global economic environment." Further, the earnings release highlighted Vivendi's "fundamentally strong operating results" and claimed that Vivendi was "the only media and communications company not to change its numbers and targets." The release also stated in part:

> After having been the only large media company not to modify any of its guidance for the year 2001, Vivendi Universal reiterates its confidence in the strength of its businesses and their performance and their ability to grow. For 2002, no other new guidance will be expressed, apart from the company's full confidence to reach for its Media and Communications businesses . . . .

188.    The March 5, 2002 earnings release also stated that based on Vivendi's "excellent" operating results, including its EBITDA and cash flow figures, Vivendi would pay a dividend in May 2002 of €1 per share.

189.    The statements in the March 5, 2002 earnings release were materially misleading and falsely presented Vivendi's financial situation. As Vivendi and its executive officers,

72

including Messier and Hannezo, knew or were reckless in not knowing, the Company's financial condition at this time was worse than Vivendi indicated because of its inability unilaterally to access the earnings and cash flow of two of its most profitable subsidiaries, Cegetel and Maroc Telecom.

190.    During the Relevant Time Period, Vivendi owned Cegetel and Maroc Telecom along with other minority shareholders. Due to legal restrictions, Vivendi (as a parent company) was not permitted unilaterally to access the cash flow of subsidiaries, such as Cegetel and Maroc Telecom, in which there were other minority shareholders. In fact, during the Relevant Time Period, Maroc Telecom did not transfer cash to Vivendi, and Vivendi only accessed Cegetel's cash through a short-term current account that Vivendi had to repay by July 31, 2002. During the Relevant Time Period, over 30% of Vivendi's EBITDA and almost half of its cash flow were attributable to those two companies.

191.    As Vivendi, Messier, Hannezo and other Vivendi executive officers knew or were reckless in not knowing during the Relevant Time Period, Vivendi's inability unilaterally to access that cash flow substantially impaired Vivendi's ability to satisfy the debt obligations and other operating costs that Vivendi had amassed in connection with its many acquisitions. As stated in the SEC v. Vivendi Universal Complaint, "In fact, at year-end 2001 and during the first half of 2002, Defendants and other senior executives of Vivendi knew or were reckless in not knowing that the Company's overall cash flow was 'zero or negative,' and that Vivendi 'produced negative cash flow from [its] core holdings' such as its entertainment businesses 'that [was] barely offset by inaccessible cash flow from minority interests' such as Cegetel and Maroc Telecom." Compl. ¶ 28 (Dec. 23, 2003). These factors hindered Vivendi's ability to reduce its

debt and meet its cash obligations, and resulted in a liquidity condition that was in stark contrast to the representations made in Vivendi's public statements.

192.    Moreover, Vivendi's claim in its March 5, 2002 earnings release that, based on the Company's "excellent" operating results, it would pay a €1 per share dividend compounded the misleading presentation of Vivendi's results. In fact, Vivendi borrowed against credit facilities to pay the dividend, which cost more than €1.3 billion after French corporate taxes on dividends.

193.    On March 5, 2002, during an investor conference call, Messier discussed the Company's fiscal year 2001 results and fiscal year 2002 expectations as follows:

> I just want to say a very quick points before going to your questions. And I – the first point here based on the fact that we experienced excellent operating results in the '01 and obviously that's very fortunate because this excellent operating results in '01 are also in the captive of the future and then we'll drive our future. I think that we build our operational reserve but what I want to point out is that if we continue or renewed on the EBITDA growth target results and add to our main in the quarter '01. We did all of this.   Our operating pre cash flow target, we average Euro 2 million instead of the guidance of Euro 1.2 – 1.5 million [sic]. Obviously the fact that the more you go to cash the more we over this – the guidance that we gave to the market is a strong sign of the quality of the casual management in working above the requirements and CAPEX management in '01. That goes to the same direction is that we did overcome largely all targets in terms of cash service. We save Euro 200 million EBITDA, we reach 300 EBITDA 100 more and close to Euro 600 million total cash savings. The operations and these business achievements, I think that we owed them to our competitive advantages that were evident in '01. That: (1) the excellent quality of management; (2) the fact that we gain market share in about every single of our business. Those gains of market shares coming from [scale and scope]; (3) the assets mix, maximize our ability to go to digitalization for delivery on the mobile devices; and (4) to our global footprint minimizes of earnings volatility. That's the business achievement.

194.    On March 6, 2002, Lehman Brothers issued a positive report based in part on the statements made by Vivendi's management in the March 5, 2002 conference call.

195.    Similarly, Bear Stearns issued a report on March 6, 2002, based on the March 5,

2002 conference call, stating in pertinent part as follows:

> The company disclosed that the €19 billion of net debt has an
> average maturity of 4-years and an average cost of 4.1%.
> Management pointed out that the strength of the group's finances
> is underlined by a recently negotiated 5-year credit facility at 45
> basis points over LIBOR.

* * *

> For '02, Management reiterated their guidance of 10% organic
> sales growth for all the Media Communications businesses, also
> expects EBITDA of close to €6 billion (pre-USA Networks and
> pre-Stream).

196.    The statements made by Defendants referenced in ¶¶ 187-188, and 193 above

were each materially false and misleading because Defendants were engaged in improper

accounting practices which had the effect of materially overstating Vivendi's reported earnings

and failed to disclose Vivendi's growing cash flow problems and lack of liquidity, including: (a)

improperly failing to disclose material commitments relating to its Cegetel and Maroc Telecom

subsidiaries which had they been disclosed would have raised concerns in the market about the

Company's liquidity and ability to access cash to meet its cash needs; (b) failing to disclose

important legal restrictions on its ability to unilaterally access the cash flow of subsidiaries

Cegetel and Maroc Telecom; (c) overstating the Company's revenue from certain multi-year

contracts; (d) improperly manipulating reserves for bad debts in the Cegetel subsidiary; (e)

improperly failing to disclose other material off-balance sheet liabilities such as the full extent of

its interest in Telco and (f) improperly consolidating the financial results of Maroc Telecom into

Vivendi's own results.  In addition, Defendants failed to disclose that Vivendi was suffering

from a growing liquidity crisis and that it would necessarily need to sell valuable assets and/or

restructure its debt obligations in order to remain solvent and avoid bankruptcy.

**(ii)     Additional False Press Releases in 2002**

197.    In addition to its March 5, 2002 earnings release, Vivendi issued other press

releases in the first half of 2002, all of which were authorized by Messier, Hannezo and other

Vivendi executive officers, that presented a materially misleading picture of the Company's

financial condition and concealed its growing inability to meet its financial obligations.

198.    On April 24, 2002, Vivendi issued a press release announcing its "strong" first

quarter 2002 Media and Communications results.  Vivendi reported a "strong surge of

operational free cash flow, up 159% to 1.4 billion euros, well ahead of expectations."  The

release, issued in New York, further reported that "[n]et debt fell from approximately 19 billion

euros to approximately 17 billion euros."  The release also reported Media and Communications

"revenue organic growth of 13% to 6.8 billion euros; EBITDA growth, up 18% to 1.1 billion

euros; and solid operating income growth, up 37% to 408 million euros."  Messier commented

on these results as follows:

> The hard numbers in the first quarter show that Vivendi Universal
> has a winning strategy, and demonstrate our commitment to
> excellent management and delivering operating results quarter
> after quarter.  In the first quarter, each operating segment delivered
> its revenue targets, and most segments over-delivered EBITDA
> and operating free cash flow compared with their budgets. . .
>
> In a difficult environment, Vivendi Universal's businesses gained
> market share.  Cash management improved dramatically.  Finally,
> the revenue and cost synergies achieved in the quarter were
> significant.  Further gains will be driven by improving businesses
> that currently have negative operating free cash flow: Canal Plus
> and Internet operations.

199.    On April 29, 2002, Vivendi issued a press release announcing purportedly

"strong" results for the first quarter of 2002, including a 12% increase in pro forma consolidated

revenue to €13.2 billion.  The release, issued in New York, also reported that consolidated

operating income grew 11% pro forma to €781 million, excluding goodwill amortization. In the

release, Messier commented on the results as follows:

> The consolidated financial results for the quarter demonstrate that
> Vivendi Universal is delivering on the strategy, goals and targets
> that we have articulated to our shareholders. In the first quarter of
> 2002, both Media & Communications and Vivendi Environment
> delivered their targets.
>
> The Media & Communications financial results released last week,
> coupled with our consolidated results issued today, are testimony
> to our ability and conviction to deliver strong results in operations,
> cash flow, EBITDA and net income. As I said last week, because
> of our strong performance in the quarter, we are lowering our
> estimate of Media & Communications year-end Debt/EBITDA
> ration to less than 3x by December 31, 2002.
>
> In a very difficult economic environment, characterized by many
> market uncertainties, Vivendi Universal's global businesses gained
> market share. In addition, strong improvement was achieved in
> cash management, debt reduction, synergies, management
> development and revenue growth.

200.    The April 29, 2002 press release further touted the Company's allegedly strong

cash flow position:

> On a pro forma basis, excluding Vivendi Universal's publishing
> businesses to be disposed of (including the B-to-B and Health
> businesses whose sale in expected to be completed n the second
> quarter), Media and Communications reported:
>
> a.    *A strong surge of operational free cash flow, up
> 159% to 1.4 billion euros, well ahead of expectations;*
>
> b.    Strong operating results in the first quarter: revenue
> organic growth of 13% to 6.8 billion euros: EBITDA
> growth, up 18% to 1.1 billion euros: and solid operating
> income growth, up 37% to 408 million euros. All were
> significantly ahead of budget. [Emphasis added.]

201.    Following the Company's April 29, 2002 Press Release, Merrill Lynch issued a

research report dated April 30, 2002 that rated the Company a "strong buy" premised on the

Company's allegedly strong financial position. Specifically, the Merrill Lynch report stated that

the "strong buy" recommendation was based, in part, on the fact that "Vivendi has now stated its net debt/EBITDA objective is less than 3x by the end of 2002. . ."

202.    The statements made by Defendants referenced in ¶¶ 198-200 above were each materially false and misleading because, *inter alia*, Defendants were engaged in improper accounting practices which had the effect of materially overstating Vivendi's reported earnings and failed to disclose Vivendi's growing cash flow problems and lack of liquidity, including: (a) improperly failing to disclose material commitments relating to its Cegetel and Maroc Telecom subsidiaries which had they been disclosed would have raised concerns in the market about the Company's liquidity and ability to access cash to meet its cash needs; (b) failing to disclose important legal restrictions on its ability to unilaterally access the cash flow of subsidiaries Cegetel and Maroc Telecom; (c) overstating the Company's revenue from certain multi-year contracts; (d) improperly manipulating reserves for bad debts in the Cegetel subsidiary; (e) improperly failing to disclose other material off-balance sheet liabilities such as the full extent of its interest in Telco and (f) improperly consolidating the financial results of Maroc Telecom into Vivendi's own results. In addition, Defendants failed to disclose that Vivendi was suffering from a growing liquidity crisis and that it would necessarily need to sell valuable assets and/or restructure its debt obligations in order to remain solvent and avoid bankruptcy.

203.    On May 3, 2002, Moody's lowered the Company's long-term debt rating to Baa3 – the lowest investment guide – one notch above "junk" status assigned to speculative investments. According to Moody's, the rating downgrade reflected Moody's concern that Vivendi "might not be able to reduce debt as quickly and comprehensively as planned."

204.    That same day, Vivendi issued a press release criticizing Moody's decision and attempting to downplay its significance:

The company believes that this decision does not fully take into consideration the currently poor market conditions and the fact that the agency does not take into account immediately the whole of the debt reduction program planned by Vivendi Universal.

This decision has no impact on Vivendi Universal's cash situation. It does not trigger any renegotiation clauses or advance repayments of bank credit lines. In addition, Vivendi Universal's use of commercial paper in the current amount of 1.6 billion euros is well covered by back-up lines of more than 3 billion euros, the availability of which will not be affected by the rating change.

Vivendi Universal affirms that it has every confidence in its ability to meet its operating targets for 2002, as proved by its first-quarter results. The company is totally determined to carry through its debt reduction program in order to make a rapid return to a comfortable position with a Baa2 rating.

205.    As a result of Vivendi's efforts to reassure the markets, Defendants were able to

limit the decline in the price of Vivendi's common stock and ADSs. Vivendi's ADSs closed

down only $1.74 (from $30.67 to $29.07) on May 3, 2002.

206.    On May 6, 2002, the *International Herald Tribune* reported:

Vivendi Universal SA could be forced to unwind billions of dollars in off-balance-sheet derivatives transactions if its credit rating slips any further, according to a detailed report of the company's accounts filed with U.S. regulators.

A downgrade Friday by Moody's Investors Service Inc. of Vivendi's long-term debt to Baa3 from Baa2 places the company's bonds within a notch of junk, or non-investment-grade status. That, in turn, puts the world's second-largest media conglomerate within a hair's breadth of triggering an immediate settlement of 3.5 billion ($3.21 billion) worth of so-called total return swaps, a kind of credit derivative, documents filed last month with the Securities and Exchange Commission show. Hundreds of millions of dollars in losses on a total return swaps and other esoteric derivatives deals have been the focus of at least one lawsuit filed against Enron Corp. and its auditor, Arthur Andersen LLP, by shareholders and employees of the bankrupt U.S. energy trader.

Derivatives are generally defined as financial instruments that derive their value from an underlying asset such as a stock. In a total return swap, parties make payments to each other based on an

asset's appreciation and depreciation, with the payment rate determined by a complex formula. Vivendi stressed Friday that the rating change had no impact on its cash situation, adding that the move "does not trigger any renegotiation clauses or advance repayments of bank credit lines." The statement did not mention the possibility of accelerated settlement of debt or swap agreements.

Asked about the implications of a further ratings downgrade for its total return swap agreements, Antione Lefort, a Vivendi spokesman, declined to answer Sunday, saying: "This is not the subject. Our goal is to carry through the debt reduction program in order to make a rapid return to a comfortable position with a Baa2 rating."

But in a 100-page annual financial statement filed with the SEC on April 15, Vivendi stated that it had entered into a number of long-term financing agreements that provided for early redemption if Moody's cut the company's credit rating below Baa3 or Standard & Poor's Corp. cut it below BBB-minus, its equivalent rating. S&P currently rates Vivendi at BBB with a stable outlook.

Vivendi's SEC filing says, "Total return swap agreements set up at the time of the sales of BSkyB and AOL Europe provide for an early unwind if Vivendi is downgraded below BBB-minus."

The report indicates that the total notional value of the two return swap transactions was 3.51 billion as of Dec. 31. Notional principal underlying a swap is usually much greater than the true risk exposure of the parties to the transaction. Vivendi did not quantify its actual risk exposure in the report.

The swap transactions relate to the sale of investments in rival media companies ordered by EU regulators as a condition for approval of Vivendi's \$34 billion acquisition of Seagram Co. of Canada in December 2000. Vivendi agreed to dispose within two years of its 22 percent stake in British Sky Broadcasting Group PLC, the satellite-television unit of Rupert Murdoch's News Corp. Last September, Vivendi arranged a complex transfer of the stake to Deutsche Bank AG of Germany in exchange for a four-year, 4.2 billion loan. Vivendi also said in the filing that it had entered into a separate two-year total return swap transaction in June 2001 in connection with the sale of \$719 million worth of preferred shares in AOL Europe, an AOL Time Warner Inc. unit, to an unidentified financial institution. Further details were not provided.

In response to these further negative press reports, the price of Vivendi ADSs closed down at

$28.26 on May 6, 2002.

207.    On May 28, 2002, Vivendi filed its 2001 20-F with the SEC, which was signed by

defendant Hannezo.  The 2001 20-F contained Vivendi's consolidated financial statement for the

year ended December 31, 2001.  The 2001 20-F also reported as follows:

> *Net Cash Flow from Operating Activities* – Net cash flow provided
> by operating activities totaled €4.5 billion in 2001, an increase of
> €2 billion from 2000.  The increase was attributed to operating
> earnings generating incremental cash flow of €1.1 billion and
> improvements in working capital of €1.5 billion, partially offset by
> approximately €600 million of cash payments made for the
> settlement of restructuring and merger-related liabilities.  Of the
> improvements in working capital, €0.8 billion was generated by
> Vivendi Environment primarily due to the implementation of a
> receivables securitization program.  In 2000, operating activities
> provided net cash of €2.5 billion compared to €0.8 billion in 1999.
> The significant improvement was primarily due to increased
> earnings generated by our Telecoms, Publishing and
> Environmental Services businesses.
>
> *Net Cash Flow from Investing Activities* – Net cash flow provided
> by investing activities was €4.3 billion in 2001 compared to net
> cash flow used for investing activities of €1.5 billion in 2000.
> Contributing to cash from investing activities was €9.4 billion from
> the sale of our spirits and wine business and €4 billion from the
> disposal of our investment in BSkyB, partially offset by capital
> expenditures for tangible and intangible assets net of sales
> proceeds of €4.9 billion and the acquisitions of Houghton Mifflin
> for €2.0 billion and Maroc Telecom for €2.4 billion.  In 2000, net
> cash used for investing activities was €1.5 billion compared to
> €12.9 billion in 1999.  The significant decrease primarily reflects
> fewer strategic acquisitions paid for in cash in 2000 compared to
> 1999. . . . Proceeds from the disposal of investments and fixed
> assets were €6.9 billion in 2000 compared to €4.5 billion in 1999,
> mainly attributable to the divestiture of non-core real estate,
> construction assets and GPU power generation plants.
>
> *Net Cash flow from Financing Activities* – In 2001, net cash flow
> used for financing activities was €7.5 billion, the principal
> components of which included a €5.9 billion repayment of long-
> term borrowings and other liabilities, a €1.7 billion decrease in
> short-term borrowings, the purchase of treasury stock for €4.3

billion and cash dividends paid of €1.4 billion, partially offset by €5.2 billion proceeds from the issuance of long-term borrowings and other liabilities and €0.6 billion net proceeds from the issuance of common stock. In 2000, net cash flow used for financing activities was €0.6 billion compared to net cash provided by financing activities of €13.7 billion in 1999. The year-on-year variance was primarily due to the Merger Transactions. In July 2000, the sale of 37% of Vivendi Environnement through an IPO contributed to an increase in financing transactions of €3.8 billion.

208.    This 2001 20-F was false and misleading because Defendants were engaged in

improper accounting practices which had the effect of materially overstating Vivendi's reported

earnings and failed to disclose Vivendi's growing cash flow problems and lack of liquidity,

including: (a) improperly failing to disclose material commitments relating to its Cegetel

subsidiary which had they been disclosed would have raised concerns in the market about the

Company's liquidity and ability to access cash to meet its cash needs; (b) failing to disclose

important legal restrictions on its ability to unilaterally access cash flow of subsidiaries Cegetel

and Maroc Telecom; (c) overstating the Company's revenue from certain multi-year contracts;

(d) improperly manipulating reserves for bad debts in the Cegetel subsidiary; (e) improperly

failing to disclose other material off-balance sheet liabilities such the full extent of its interest in

Telco and (f) improperly consolidating the financial results of Maroc Telecom into Vivendi's

own results. In addition, Defendants failed to disclose that Vivendi was suffering from a

growing liquidity crisis and that it would necessarily need to sell valuable assets and/or

restructure its debt obligations in order to remain solvent and avoid bankruptcy.

209.    On May 30, 2002, Vivendi issued a press release falsely stating that its "cash

situation, which, the Company believes, is comfortable — even assuming an extremely

pessimistic market — will enable the Company to continue its debt reduction program with

confidence and with a view to creating the best possible value for its shareholders." The press

release further provided:

82

> Vivendi Universal confirms having obtained agreement from the banks to delete the clauses that linked the availability of credit lines to a rating level. The Company's bank credit line are [sic] therefore, no longer dependent on rating agencies' decisions.
>
> ***Additionally, the Company has no reason to anticipate or fear any further deterioration in its credit rating.***

210. This press release was false and misleading because Vivendi's cash situation was not "comfortable," and Vivendi, Messier, Hannezo and other Vivendi executive officers knew at this time, or were reckless in not knowing, that Vivendi's cash flow was "zero or negative."

211. On May 31, 2002, Vivendi ADSs closed up $1.23, at $31.05.

212. Indeed, as reported in the October 31, 2002 *Wall Street Journal* article, the board, concerned there was a liquidity problem, had hired Goldman Sachs the day before, on May 29, 2002, to analyze the Company's cash situation.

213. On June 24, 2002, Goldman Sachs informed Vivendi's top executives and certain members of the board that Vivendi was in danger of having to file for bankruptcy as early as September or October. That day, Vivendi's share price fell 25%, to €18.75. Goldman Sachs repeated its findings to the full board the next day, June 25, 2002.

214. On June 26, 2002, Vivendi issued a press release in response to media speculation regarding the Company's liquidity. In that press release, Vivendi claimed that it had "around €3.3 billion in unused credit lines. This is available to back up its commercial paper outstanding of nearly €1 billion. The cash situation has greatly improved since the beginning of the year." Vivendi also claimed that "[o]wing to its strong free cash flow, combined with the execution of the disposals program and potential bond issues, Vivendi Universal is confident of its capacity to meet its anticipated obligations over the next 12 months."

215. Vivendi's access to credit, however, was much worse than this press release indicated. In fact, the day before Vivendi issued its June 26, 2002 press release, at least €900

million of the €3.3 billion in Vivendi credit lines expired. Further, by this date, Vivendi's "cash

situation" had not improved since the beginning of the year, but rather had worsened as a result

of a demand made weeks earlier by Cegetel's minority shareholders for the repayment of a

current account pursuant to which Cegetel made its excess cash available to Vivendi.

216.    On June 26, 2002, Messier discussed the Company's debt and liquidity during an

investor conference call as follows:

> I have read, I held in the markets all certainties, question, rumors
> in the current environment relating to views, view for yourselves,
> views for your accounting and I seen that in those circumstance.
> *The best that we can do is to show you [that] there is no hidden*
> *liability that's you have all the information to come back.*
> [Emphasis added.]

217.    On June 26, 2002, the *Dow Jones International News* reported:

> Chairman Jean-Marie Messier said late Wednesday that he plans to
> stay in charge of the embattled media company despite criticism of
> his strategy and a crumbling share price. . .
>
> Messier sought to counter those doubts, opening the call with a
> comment that the company has no hidden, off-balance sheet
> liabilities and adding, *"We feel very confident looking to our debt*
> *and cash analysis with all our commitments of the group for the*
> *coming 12 months."*

218.    Vivendi's June 26, 2002 press release and subsequent comments by Messier

reassured a number of market analysts. For example, on June 27, 2002, Merrill Lynch issued a

"strong buy" recommendation for the Vivendi stock, stating:

> We believe the rapid share price fall of some 25% in the last two
> weeks is unwarranted and expect ongoing deleveraging and
> improving confidence in the company's short term liquidity
> position should begin to revive interest in the shares.

219.    Defendants' attempts to reassure the market and to deny that it had any liquidity

problems were materially misleading. Defendants knew, or were reckless in not knowing, that

84

Vivendi's financial condition was precarious and that there was significant risk that it would be unable to pay its debts as they became due.

220.    The statements made by Defendants referenced in ¶¶ 209, 214, and 216-217, above were each materially false and misleading because, *inter alia*, Defendants were engaged in improper accounting practices which had the effect of materially overstating Vivendi's reported earnings and failed to disclose Vivendi's growing cash flow problems and lack of liquidity, including: (a) improperly failing to disclose material commitments relating to its Cegetel subsidiary which had they been disclosed would have raised concerns in the market about the Company's liquidity and ability to access cash to meet its cash needs; (b) failing to disclose important legal restrictions on its ability to unilaterally access the cash flow of subsidiaries Cegetel and Maroc Telecom; (c) overstating the Company's revenue from certain multi-year contracts; (d) improperly manipulating reserves for bad debts in the Cegetel subsidiary; (e) improperly failing to disclose other material off-balance sheet liabilities such the full extent of its interest in Telco and (f) improperly consolidating the financial results of Maroc Telecom into Vivendi's own results. In addition, Defendants failed to disclose that Vivendi was suffering from a growing liquidity crisis and that it would necessarily need to sell valuable assets and/or restructure its debt obligations in order to remain solvent and avoid bankruptcy.

221.    On July 2, 2002, Vivendi's debt was downgraded again amid reports that the Company was in danger of default. On July 2, 2002, *Bloomberg* reported that Messier told employees in an e-mail that "he may have gone 'too fast, too far. Some mistakes were made,' he said, 'They can all be fixed, and I had started doing so.'" On July 3, 2002, Vivendi's CEO, Messier was forced to resign.

222.    Vivendi ADSs and ordinary shares collapsed upon these revelations, falling to as

low as $13.40 and €13.90 and closing at $15.66 and €13.90, respectively, on huge volumes of

7.4 million ADSs and tens of millions of shares.

223.    On July 3, 2002, the Company, through its new management, published a press

release acknowledging that the Company has "a short-term liquidity issue." The release further

stated that Vivendi had to repay creditors €1.8 billion by the end of July 2002 and that €3.8

billion in credit lines were up for renegotiation:

> [I]n light of the Moody's and Standard & Poor's downgrades of
> Vivendi Universal debt ratings of July 1 and 2, 2002, respectively,
> as well as other events that have occurred over the past several
> days, including the resignation of Mr. Jean-Marie Messier from his
> positions at Vivendi Universal, Vivendi Universal believes it is
> important to update the investor community and the markets
> generally regarding its short-term cash position and liquidity . . .
>
> As of July 3, 2002, Vivendi Universal has 1.2 billion euros of cash
> and 1.6 billion euros in unused credit lines of which at least 600
> million euros can be used for general corporate purposes and the
> rest can be used as backing for certain types of its commercial
> paper (400 million euros of which is currently outstanding).
>
> **Payments totaling approximately 1.8 billion euros remain due by
> the end of July. These will be financed from resources totalling
> approximately 2.4 billion euros comprising cash and draw-downs
> on existing credit facilities.**
>
> Several of Vivendi Universal's credit lines automatically roll over
> at certain specific dates in accordance with their terms, subject to
> standard material adverse change provisions.    **Of those,
> approximately 3.8 billion euros are scheduled to roll-over in July.**
>
> In addition, Vivendi Universal has initiated discussions with its
> main credit banks with a view to putting in place new credit
> facilities as soon as feasible.
>
> While Vivendi Universal has a short-term liquidity issue, the value
> of the group's broad and diversified assets by far exceed that of its
> debt. The new management is committed to a program of
> aggressive deleveraging and greater transparency in order to

restore health and confidence in Vivendi Universal.  [Emphasis added.]

224.    On July 3, 2002, in *The Columbian*, Messier continued to defend Vivendi's

financial statements:  "'There are no underestimated liabilities.  There are no overvalued assets.'

Messier said, "'Our results are true, genuine and complete.'"

225.    On July 5, 2002, the *Globe and Mail* reported:

> With new management in place, ***Vivendi Universal SA finally
> admitted what its ousted chairman and chief executive officer,
> Jean-Marie Messier, had strenuously denied in recent weeks:
> The media-and-utility conglomerate is in a danger of a cash
> crunch.***
>
> Based on a detailed liquidity statement Vivendi put out late
> Wednesday, credit analysts estimate that Vivendi could face a cash
> shortfall of 2.7 billion euros ($2.64-billion U.S.) by the end of the
> year, expanding to as much as 5.5 billion euros by the middle of
> 2003, unless it can quickly secure a new multibillion-euro credit
> line from its lenders.
>
> The statement came after a three-hour board meeting late
> Wednesday in Paris where the Vivendi board accepted the forced
> resignation of Mr. Messier.  The board, as expected, chose Jean-
> Rene Fourtou, a top executive of Aventis SA, the Franco-German
> pharmaceutical giant, as its new CEO.
>
> In its statement, Vivendi said it must repay 1.8 billion euros this
> month and said the payment would be financed from 2.4 billion
> euros in existing cash and credit lines.  It also has a 3.8 billion-euro
> credit line that will roll over this month unless the banks determine
> there has been a "material adverse change" with the company.
>
> This grim outlook contrasts with Mr. Messier's recent assurance
> that the "treasury situation" at Vivendi – owner of Universal
> Studios, Universal Music Group, USA Networks and minority
> stakes in a host of other assets – was "comfortable even in the most
> pessimistic market hypotheses."  [Emphasis added.]

226.    The statements made by Defendants referenced in ¶¶ 221, and 223-225, above

were each materially false and misleading because Defendants still failed to disclose the full

magnitude of its growing liquidity crisis and that it would necessarily need to sell valuable assets

and/or restructure its debt obligations in order to remain solvent and avoid bankruptcy.

227. On August 14, 2002, the Company's new management stated that, pursuant to

French GAAP, Vivendi suffered a €12 billion net loss for the first half of 2002 and would take

an €11 billion goodwill write-down of depreciated assets. Debt rating agency Standard & Poor's

slashed Vivendi's long-term corporate credit to junk status that same day. As the *Associated*

*Press* reported on August 14, 2002:

> Vivendi Universal, the teetering French media conglomerate,
> reported a massive loss of $12 billion for the first half of the year
> and said it will pare debt by selling $10 billion in assets including
> the U.S. publisher Houghton Mifflin.
>
> Adding insult to injury, a ratings agency downgraded the
> company's debt to junk. . . .
>
> The sale of Houghton Mifflin, which the company only bought last
> year for $1.7 billion, appeared to mark a first step toward breaking
> up the entertainment and media empire built up by Vivendi's
> former chairman, Jean-Marie Messier, in a whirlwind of costly
> acquisitions.
>
> In all, Vivendi said it hopes to dispose of at least $9.8 billion worth
> of assets – half of them within nine months, the rest within two
> years.
>
> *"We are facing a liquidity problem,"* said chairman Jean-Rene
> Fourtou, who took over July 3 after Messier's ouster. Fourtou said
> he would "try to avoid any fire sale, but we have negotiations that
> could be concluded very soon if the price was lowered."
> [Emphasis added.]

228. In response to these further stunning developments, on August 14, 2002, Vivendi

common stock closed at €11.89, down more than 4 euros (or approximately 25%) from its close

the previous day. Vivendi's ADSs suffered a similar decline, closing down $3.67 at $11.66.

## THE FALLOUT – A SMALLER COMPANY
## AND CRIMINAL AND CIVIL INVESTIGATIONS

229.  Defendants' improper accounting practices and failure to disclose the truth

concerning Vivendi's liquidity crisis gave rise to fraud investigations on both sides of the

Atlantic.  On July 9, 2002, *Bloomberg* reported that French stock market regulators, the COB,

were "probing the Financial information released by Vivendi Universal SA since January 2002,"

and on July 10, 2002, *The Wall Street Journal* reported that French regulators raided Vivendi's

Paris headquarters as part of an investigation into whether Vivendi had disclosed relevant

information to investors in the prior 18 months.  In addition, on October 29, 2002, *Bloomberg*

reported that French prosecutors had opened a criminal investigation.  As *Bloomberg* reported:

> The investigation will examine whether Vivendi "published false
> accounts for 2000 and 2001 to hide the true nature of its financial
> situation," a spokeswoman for the prosecutor's office said.  It will
> also look at whether the Paris-based company gave misleading
> outlooks for 2001 and 2002.

230.  On December 12, 2002, *Bloomberg* reported that a police team from the Finance

Brigade of the Paris Public Prosecutor's office had raided both Vivendi's headquarters in Paris as

well as Messier's home.  The Finance Brigade raided Canal Plus' headquarters the next day, and

also raided the homes or offices of various Vivendi directors.

231.  In the United States, Vivendi's accounting practices and financial disclosures

were also the subject of both a formal SEC investigation and a federal criminal investigation.  As

the November 5, 2002 *The Wall Street Journal* reported:

> The U.S. attorney's office is coordinating its probe with the U.S.
> Securities and Exchange Commission, which already has been
> conducting an informal inquiry into Vivendi, the company said in a
> statement.
>
> The main focus of the U.S. attorney's investigation, which is in its
> early stages, remains unclear, as does whether it will lead to any
> charges being filed.  But one of the issues that has come under

scrutiny by French authorities is the accuracy and timeliness of Vivendi's financial disclosures under its former chairman, Jean-Marie Messier, who was ousted in early July.  France's stock-market watchdog, the Commission des Operations de Bourse, launched a probe at that time and is looking to see whether Mr. Messier may have misled his board and investors with overly rosy assessments of Vivendi's financial health, according to people familiar with that probe.

The U.S. probe also may encompass accounting, as the Paris public prosecutor's office has included accounting in its own investigation.  Among other issues, the Paris prosecutor's office said it would seek to establish whether Vivendi published "false accounts for the fiscal years that ended on Dec. 31, 2000 and Dec. 31, 2001."

On November 19, 2002, *Bloomberg* reported that the SEC's informal inquiry had been upgraded to a formal investigation.

232.    In the wake of the public admission that the Company was facing a cash crunch, Vivendi's new management set about the process of raising revenue by jettisoning some of the conglomerate's major assets.  Media reports indicated that the Company had enough cash to last only until October 2002, putting Vivendi in a dire position.  To clean up the mess Messier's costly acquisitions had made of the Company's finances, Vivendi announced an ambitious plan to shed €16 billion in assets between July 2002 and the end of 2004.  Vivendi's "garage sale" included the following dispositions:

| Date | Disposition | Price |
|---|---|---|
| July 2002 | B2B/Health | €150 million |
| July 2002 | Lagardére | €44 million |
| July 2002 | Vinci | €291 million |
| December 2002 | Vizzavi | €143 million |
| December 2002 | Houghton Mifflin | €1.567 billion |
| December 2002 | VUP publishing activities in Europe | €1.138 billion |

| Date | Disposition | Price |
|---|---|---|
| December 2002 | Veolia Environment | €1.865 billion |
| December 2002 | EchoStar | €1.037 billion |
| December 2002 | Sithe Energies, Inc. | €319 million |
| February 2003 | Consumer Press division | €200 million |
| February 2003 | Canal Plus Technologies | €191 million |
| April 2003 | Telepiù | €831 million |
| May 2003 | Fixed-line Telecommunication in Hungary | €315 million |
| May 2003 | Comareg | €135 million |
| May 2003 | Interest in Vodafone Egypt | €43 million |
| June 2003 | InterActive Corp. warrants | €600 million |
| June 2003 | Interest in Sithe International | €40 million |
| June 2003 | VUE real estate | €276 million |
| October 2003 | Canal Plus Nordic | €48 million |
| February 2003 | Atica & Scipione | €31 million |
| March 2004 | Sportfive | €274 million |
| May 2004 | Vivendi Universal Entertainment | €2.312 billion |
| May 2004 | Kencell | €190 million |
| June 2004 | Monaco Telecom | €169 million |
| June 2004 | Egée and Cédre Towers | €84 million |
| August 2004 | Interests in VIVA Media | €47 million |
| September 2004 | Canal Plus Group headquarters | €108 million |
| October 2004 | UCI Cinemas | €170 million |
| December 2004 | 15% of Veolia Entertainment | €1.497 billion |

233.    Unfortunately for Vivendi, however, its woes were not limited to its bloated

balance sheet. On October 30, 2002, the Paris public prosecutor's office announced it had begun

a criminal investigation into whether Vivendi had published false accounts for the years 2000

and 2001. A few days later, Vivendi announced that a separate investigation had been opened on

the other side of the Atlantic by the United States Attorney's Office for the Southern District of

New York. The U.S. Attorney announced that it planned to coordinate its efforts with the SEC, which had already begun to conduct an informal inquiry into Vivendi.

234.     On November 20, 2002, the SEC announced that it had upgraded its inquiry into Vivendi from an informal inquiry to a formal investigation. The SEC made clear that it intended to review Vivendi's accounting and the veracity of its public disclosures. In connection with these enforcement efforts, the SEC in September 2003 obtained a court order forcing Vivendi to place in escrow $23 million it had earmarked to pay a severance package Messier negotiated just before his ouster. Messier was similarly barred from executing a judgment he had obtained via an arbitration in New York State Court concerning this severance package.

235.     On September 13, 2003, the COB – following a fourteen month investigation – announced its conclusion that the Defendants had made false financial disclosures. The COB found that Defendants, among their other failures, had not disclosed to investors the growing cash problems Vivendi faced during the end of Messier's tenure.

236.     The United States-based investigations into the crisis engendered by Messier's more than $75 billion acquisition spree came to a stunning conclusion on December 24, 2003. That day, the SEC filed and simultaneously settled securities fraud charges against Vivendi, Messier and Hannezo, imposing fines totaling $51 million. The SEC charged Vivendi, Messier and Hannezo with multiple violations of the federal securities laws committed between December 2000 and July 2002. Specifically, the SEC contended that these parties had engaged in a course of fraudulent conduct that disguised the Company's cash flow and liquidity problems, improperly adjusted accounting reserves to meet predetermined EBITDA targets, and failed to disclose material commitments at Cegetel.

.

237.    In addition to the massive fines imposed against them, Messier and Hannezo both entered into consent decrees permanently enjoining them from further violations of the federal securities laws and barring them from service as officers or directors of any public companies for respective ten and five year periods.

238.    Subsequently, the SEC on April 14, 2004 issued an order instituting and simultaneously settling administrative cease and desist proceedings against John Luczycki, Vivendi's former Chief Accounting Officer and Controller. The SEC found that Luczycki had willfully violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, ordering him to cease and desist from violating the antifraud provisions of the federal securities laws and prohibiting him from practicing as an accountant before the SEC for at least three years.

239.    While French regulators were slower to bring the Vivendi debacle to a conclusion, they imposed fines of €1 million each on the Company and Messier on November 3, 2004 – marking only the second time the French Financial Markets Authority had come this close to meeting its €1.5 million fine cap.

240.    On January 17, 2006, the Company announced plans to discontinue its ADS program, citing concerns over the costs of complying with United States disclosure requirements.

241.    In the end, Messier's $77 billion acquisition spree wreaked havoc on the Company, causing the Company's ADSs to suffer a staggering 85% decline from their Relevant Time Period high of $75.50 and its common shares to suffer an equally stunning 83.9% decline from their Relevant Time Period high of €86.50.

## ADDITIONAL FACTS CONCERNING
## THE DEFENDANTS' FAILURE TO DISCLOSE MATERIAL
## ADVERSE FACTS CONCERNING VIVENDI'S SEVERE LIQUIDITY PROBLEMS

242.     For the reasons set forth in the preceding ¶¶ 52-70, 79-102, 116-123, and 133-140, Defendants materially overstated Vivendi's financial performance during the Relevant Time Period in violation of GAAP.

243.     However, during the Relevant Time Period, Defendants also repeatedly made material misstatements and omissions concerning the Company's liquidity.  Unbeknownst to investors or the financial markets, and contrary to Defendants' repeated assurances that the Company was in strong financial condition, Vivendi's implementation of its growth-by-acquisition strategy caused it to overpay for businesses and saddled the Company with a huge debt burden that the operations of the acquired businesses could not satisfy.

244.     As a result, Vivendi was under great strain to meet its obligations in the ordinary course as they came due.  The causes of Vivendi's liquidity problems included Vivendi's inability to generate expected cash flows from acquired companies.  As set forth in detail above, Vivendi's financial performance fell sufficiently short of the expectations that Defendants had fostered during the Relevant Time Period and Defendants caused Vivendi to engage in a variety of GAAP violations to conceal the Company's actual results.

### The Magnitude Of The Undisclosed Liquidity Problem

245.     As subsequently reported by the *Wall Street Journal* in an article entitled Damage Control:  How Messier Kept Cash Crisis at Vivendi Hidden For Months — Media Giant Was a Risk Well Before Investors Knew and dated October 31, 2002, Vivendi's acquisition spree, together with the other factors referenced in the preceding paragraphs, had put Vivendi on the brink of catastrophe:

94

On Dec. 13, [2001], Guillaume Hannezo sent Jean-Marie Messier, chairman of Vivendi Universal SA, a desperate handwritten plea.

"I've got the unpleasant feeling of being in a car whose driver is accelerating in the turns and that I'm in the death seat," wrote Mr. Hannezo, the company's chief financial officer. "All I ask is that all of this not end in shame."

That very day, unknown to investors and the Vivendi board, the company had narrowly averted a downgrade by credit-rating agencies, which would have made it difficult to borrow money and plunged the company into a cash crisis. Mr. Hannezo (pronounced AN-ZO), implored his boss and longtime friend to take serious steps to reduce Vivendi's ballooning debt.

When the company's board met the next day to consider whether to approve a roughly $10 billion acquisition of USA Networks Inc.'s TV and film businesses, Mr. Messier made no mention of the close call with the rating agencies. Instead, when a director asked about Vivendi's financial profile, Mr. Messier said the company had no problem, according to two directors who were there.

The board endorsed the USA Networks deal, buying Mr. Messier's pitch that it would help complete Vivendi's transformation from a onetime water utility into an entertainment giant. He boasted that the company would be able to distribute the movies and music made by its Universal Studios and Universal Music units by means of cellular devices, as well as by satellite, cable and pay television.

But Vivendi was already in dire financial straits. The USA Networks deal, along with a $1.5 billion investment in satellite-TV operator EchoStar Communications Corp., in fact signaled the beginning of the end for Mr. Messier. The boy wonder of the French business establishment was ousted seven months later in, July, after directors discovered the company was skirting close to a bankruptcy filing.

As new management struggles to salvage the French conglomerate, it has become clear that Vivendi came close to financial disaster far earlier then previously thought. *That picture is starkly at odds with the one repeatedly presented by Mr. Messier to investors and his board.* [emphasis added]

246.    Similarly, citing an article first appearing in *Le Monde*, *Bloomberg* reported on

May 14, 2002 that Vivendi was close to insolvency at the end of 2001:

Vivendi Universal SA, the world's second-largest media company, was close to insolvency at the end of 2001 after delays in planned asset sales, French daily Le Monde said, without citing anyone.

Delays in the sale of the Seagram liquor unit and a French magazine business caused a "serious cash crisis" at the Paris-based company, which faced payments of about 10 billion euros ($9 billion) at the end of last year, the paper said. Today, Vivendi's businesses "barely produce the cash needed to pay the bills," according to the report.

\* \* \*

Vivendi's cash woes help explain why the company sold 55 million of its own shares in January, 9 percent of Vivendi Environment SA, as well as its stake in AOL Europe and British Sky Broadcasting Plc, Le Monde said. Since the beginning of the year, Vivendi shares have lost half their value.

247.    Although Defendants denied any pending liquidity crisis in response to the *Le*

*Monde* report and reassured investors during the spring and early summer of 2002 that Vivendi

could meet its obligations for the next 12 months, in reality the Company continued to teeter on

the edge of bankruptcy. As the October 31, 2002 *Wall Street Journal* article further reported:

In May [2002] Fehmi Zeko, head of the media group for Citigroup's Salomon Smith Barney investment bank, met with Mr. Bronfman in New York and told him what the bank had learned during its financial analysis in Paris. By then, news of Vivendi's costly put-option obligations had surfaced in the press, and Moody's Investors' Service had downgraded Vivendi's debt to just a notch above "junk" level.

After the meeting, Mr. Bronfman phoned Mr. Hannezo, who denied there was a problem, according to people familiar with the conversation. Mr. Bronfman nevertheless insisted that Vivendi bring in an outside firm to analyze its cash situation. At a meeting in New York on May 29, the board hired Goldman Sachs.

*On June 24, the eve of Vivendi's next board meeting in Paris, Goldman Sachs bankers gave a detailed rundown of their conclusions to Vivendi's top executives and a handful of directors, including Mr. Bronfman, according to people familiar with the situation. The investment bank outlined four scenarios, one of which showed Vivendi having to file for bankruptcy*

*protection as early as September or October. That day Vivendi's share price dropped 23%.*

After Goldman Sachs grim presentation, Mr. Messier asked Mr. Bronfman to come to his office. Mr. Bronfman told Mr. Messier he should resign, as it was now clear Vivendi faced a severe cash crisis, according to a person familiar with the conversation.

\* \* \*

At the COB's request, Mr. Messier put out a detailed debt-and-liquidity statement the next morning, June 26. *Echoing four upbeat press releases he had issued in previous weeks, Mr. Messier said, "Vivendi Universal is confident of its capacity to meet its anticipated obligations over the next 12 months."* That afternoon he told analysts on a conference call that he planned to remain Vivendi's chairman for 15 more years.

\* \* \*

*At a French parliamentary hearing last month, Jean-Rene Fortou, Vivendi's new chairman, was asked about Vivendi's finances when he took the company's reins July 3. "Well, if Mr. Messier had stayed, the company would have gone bankrupt within 10 days," he said.* [Emphasis added.]

248.    Similarly on September 27, 2002, the *AFX News* reported:

Vivendi Universal chairman Jean-Rene Fourtou said the company would have been forced to declare bankruptcy within 10 days if Jean-Marie Messier had not resigned, according to a report in Le Figaro.

249.    On December 13, 2002, the *Associated Press* reported, based on an article first appearing in *Le Monde*, that defendant Hannezo admitted that 2001 was marked by a series of errors, including underestimating the debt problem:

Electronic mail seized in a probe of alleged financial irregularities at Vivendi Universal and other documents show a bitter climate of tension amid a growing debt crisis that led to the fall of flamboyant Chairman Jean-Marie Messier.

Board member Edgar Bronfman Jr., of Canada's Seagrams empire, bought out by Vivendi, warned Messier in an e-mail that he could be courting danger with his "very costly personal shows," according to Friday's edition of the newspaper Le Monde.

And former Financial Director Guillaume Hannezo, in a note to France's stock exchange watchdog, said Messier had turned Vivendi into a "permanent deal machine," while an "urban guerrilla atmosphere" gripped a divided board, the newspaper said.

\* \* \*

Hannezo, the former finance director, said in his 20-page report to the COB that 2001 was marked by the "accumulation of a series of errors," including underestimating the debt problem, according to Le Monde.

\* \* \*

Hannezo, a key figure in the COB investigation, speculated that Vivendi could have been spared its debt mountain in 2001 "had it resolved to sell before buying . . . Unfortunately, it oriented itself toward the inverse choice, satisfying itself with potential riches," he wrote. Vivendi's shares tumbled around 75 percent this year.

## ADDITIONAL SCIENTER ALLEGATIONS

250. Throughout the Relevant Time Period, Defendants intentionally, or at the very least recklessly, made materially false and misleading statements and concealed material information regarding Vivendi's financial condition, as alleged herein. Many of the misstatements and omissions were the results of intentional deception and intentional violations of GAAP by Defendants, for the purposes of boosting Vivendi's common share and ADS prices.

251. As set forth elsewhere herein in detail, Messier and Hannezo – by virtue of their receipt of information reflecting the true facts regarding Vivendi, their control over and/or receipt and/or associations with the Company that made them privy to confidential proprietary information concerning Vivendi – were active and culpable participants in the fraudulent scheme alleged herein. The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the market and to Plaintiffs.

98

252.    Vivendi is charged with the knowledge possessed by its senior officers, including Messier and Hannezo.

253.    Individual Defendants' intentional misconduct included, *inter alia*, authoring and enforcing improper accounting practices and demanding that Vivendi's employees misapply GAAP in order to mask the liquidity and cash flow situation that Vivendi was suffering.

254.    During the Relevant Time Period, the Individual Defendants signed Vivendi's Forms 20-F, Annual Reports and/or Forms 6-K with knowledge that they falsely represented Vivendi's financial results, or with reckless disregard for their truth or falsity.

255.    By mid-December 2001, Defendants knew that Vivendi had just narrowly avoided a downgrade in its investment status by the credit rating agencies that, had it happened, would have nearly eliminated Vivendi's cash and would have deleteriously impacted the Company's ability to borrow more funds from its credit facilities for further acquisitions. In fact, it was that near downgrade that gave Hannezo the "unpleasant feeling of being in a car whose driver is accelerating in the turns" with him in the "death seat," and led him to implore Messier that "all of this not end in shame." Nevertheless, Messier chose to not mention the narrowly-averted credit rating downgrade when urging Vivendi's Board of Directors to approve the $10 billion acquisition of USA Networks' television and film business just two days later, and both he and Hannezo continued to sign off on Vivendi's false disclosures about, *inter alia*, its cash and liquidity situation.

256.    Additional evidence of Defendants' scienter is the fact that, even though Vivendi claimed in its March 5, 2002 earnings release that, based on the Company's "excellent" operating results, it would pay a €1 per share dividend, Vivendi had had to borrow against credit facilities to pay the dividend, which cost more than €1.3 billion after French corporate taxes on

dividends. Similarly, despite stating in Vivendi's June 26, 2002 press release that it had "around €3.3 billion in unused credit lines . . . to back up its commercial paper outstanding of nearly €1 billion" and that the cash situation had greatly improved since the beginning of the year, just one day before Vivendi issued that press release, at least €900 million of the €3.3 billion in Vivendi credit lines had expired, and Vivendi's cash situation had in fact worsened as a result of a demand made weeks earlier by Cegetel's minority shareholders for the repayment of a current account pursuant to which Cegetel made its excess cash available to Vivendi.

257. Further evidencing of Defendants' scienter is their actions taken with respect to Vivendi's off-balance sheet liability that further threatened Vivendi's liquidity and ultimately cost Vivendi hundreds of millions of dollars and impaired Vivendi's liquidity crisis. In late 2000 and 2001, Defendants wagered on the future success of the Company by selling put options to raise cash to fund executive compensation. These put options obligated Vivendi to purchase in the future at least 22.8 million of its own shares, or approximately 2% of all outstanding Vivendi stock, at an average price of €69. Even as Vivendi's share price dropped during 2001 and the first half of 2002, making it increasingly likely that the Company would take a staggering loss on the options, Defendants continued to misrepresent and/or fail to disclose Vivendi's true liquidity condition.

258. In its 2002 half year financial statements released August 14, 2002, Vivendi disclosed the impact its put obligations had during the first six months of 2002 alone, noting the €239 million resulting expense.

259. The magnitude of the impact of Defendants' fraud also strongly evidences Defendants' intentional or reckless conduct. As set forth above, the revelation of Vivendi's truly dismal liquidity situation – including a €19 billion debt burden – caused it to teeter on the edge

100

of bankruptcy, dried up its credit lines, caused its credit ratings to crumble, triggered its credit facility covenants' ratings thresholds, and led its lenders to refuse to extend to Vivendi sorely needed fresh credit. Vivendi itself admitted that it faced having to reduce its debt by billions of euros in order to achieve an acceptable capital structure. This cash and liquidity crisis did not happen overnight but, rather, was the direct result of Defendants' deliberate, steady collision course driven by their insatiable appetite for more acquisitions and the attendant prestige, power and money that would inure to them as the world's leading media and entertainment group. The extent of the crippling debt load, which Vivendi only first started to publicly admit it was bearing in July 2002, directly belied the financial picture that Defendants presented to the securities markets during the Relevant Time Period.

260.    Defendants' scienter is further evidenced by the fact that, commencing immediately on the heels of the disclosure that the Company's viability going forward was threatened absent a "fire sale of its assets," new management rapidly downsized the Company, sold off major assets and restructured it. *See* ¶ 232 above. Those actions demonstrate the extent of the bloat, waste and excess caused by Defendants' hunger for a global empire that they built by means of a fraudulent scheme that misled investors about Vivendi's financial condition, cash and cash flow positions, and liquidity situation.

261.    In the arbitration proceedings brought by Messier to enforce the terms of his termination agreement with Vivendi, Vivendi itself stated that Messier caused Vivendi's near collapse. In addition, as reported by the Associated Press on December 13, 2002, Hannezo admitted that "2001 was marked by 'the accumulation of a series of errors,' including underestimating the debt problem." Further, Vivendi's new CEO also admitted at a French

101

parliamentary hearing in September 2002 that had Messier remained CEO of Vivendi beyond July 3, 2002, Vivendi would have gone bankrupt "within 10 days."

262.    The criminal, civil and regulatory authorities in the United States and in France (including the SEC, the United States Attorney's Office, public prosecutors in Paris and the COB) that investigated and/or commenced proceedings against Defendants all focused on the same question: whether Vivendi, Messier, Hannezo and other Vivendi executives misled investors with overly rosy assessments of the Company's financial health. As a result of its investigation, the SEC found that Vivendi, Messier and Hannezo violated the federal securities laws, including Section 10(b) of the Exchange Act. The French Financial Markets Authority concluded that Vivendi had committed irregularities in its financial disclosures and fined Vivendi and Messier €1 million each for making misleading financial disclosures between 2000 and 2002.

263.    Individual Defendants had the motive and opportunity to commit fraud because they had the means and the likely prospect of achieving concrete benefits from their fraudulent conduct. Messier wanted Vivendi to be a worldwide empire and Vivendi was on an unrelenting quest to maintain and expand its enterprise. In total, Vivendi spent over $75 billion in pursuit of Messier's ambition to create the world's number-one entertainment company through rapid acquisitions of companies in the United States and abroad, using Vivendi's securities consideration. Defendants achieved that objective by artificially maintaining the value of Vivendi's common shares and ADSs and by propping up their price through the dissemination of the materially false and misleading statements described in detail above. In addition, Vivendi's ability to maintain positive credit ratings and thereby to obtain additional financing for further

acquisitions depended on Defendants' fraudulent scheme. Vivendi's global reach could not have been achieved *without* Defendants' fraudulent inflation of Vivendi's share price.

264.    Messier had an even greater motive for inflating the appearance of Vivendi's financial performance from which he derived concrete benefit by virtue of his fraudulent conduct: his bonus was pegged to Vivendi achieving specific earnings results, stock options and other perks such as a personal assistant, security guards and the use of a $17 million Park Avenue penthouse at below market rate. As reported in Vivendi's 2001 20-F, Messier received 835,000 stock options and earned $4.8 million in compensation. Of that amount, more than $3 million -- two-and-a-half times his salary -- comprised his bonus, which he received because Vivendi's EBITDA had increased that year by more than 30%. Had Vivendi's earnings increased by more than 35%, Messier would have received three times his base salary as a bonus. Hannezo likewise received extremely lucrative compensation and remuneration that was dependent upon the Company's achievement of certain financial targets. By manipulating the Company's accounting to create the illusion that those targets had been achieved, Messier and Hannezo created an entitlement to bonuses they would not have received if the Company's financial results had been accurately reported.

265.    As CEO, Messier was the public voice of Vivendi and was therefore in a position to communicate, as he did during conference calls and in press releases and other public documents, false and misleading statements concerning the Company's financial condition, its compliance with GAAP and the veracity of its financials. Messier signed or authorized all of the Company's SEC filings, Annual Reports and press releases during the Relevant Time Period. Hannezo signed many of the Company's SEC filings and Annual Reports, as alleged herein. Further, Hannezo oversaw the Company's accounting and financial reporting, was responsible

103

for creating and approving accounting policies and procedures, and was directly involved in the preparation of the Company's financial statements. Thus, Messier and Hannezo had the ability to control the Company's accounting as well as the content of its financial statements and disclosures. Both had the motive and the opportunity, which they took, to commit fraud.

266.    Vivendi had an obvious opportunity to commit fraud, because it published and controlled the content of its own financial statements and other public statements, and because it controlled its own accounting and financial reporting functions, by which the fraud was perpetrated.

267.    Messier's and Hannezo's scienter is further evidenced by their clandestine insider trading during the Relevant Time Period. According to an article in The Wall Street Journal dated January 24, 2003, Messier and Hannezo (and other senior executives of Vivendi that were part of Messier's "dream team") exercised options and sold stock days before an abrupt, huge share placement in the first weeks of 2002 by Vivendi that Messier had arranged to raise desperately needed cash. That transaction sent Vivendi's common share and ADS price crashing. Specifically, as reported by *The Wall Street Journal*, on or about December 28, 2001, just days after writing the "death seat" memo and before the stock sale transaction, Hannezo exercised stock options that earned him a profit of €1.3 million ($1.4 million). An April 11, 2003 article in *The Wall Street Journal* reported that Vivendi acknowledged that Messier also sold 152,000 shares on December 21, 2001 and 106,669 shares on December 27, 2001. In addition, Agnes Touraine, head of Vivendi Universal Publishing, and Catherine Gros, chief of Vivendi's communications department, also exercised stock options at or around the same time. Shortly thereafter, on or about January 7, 2002, Vivendi unexpectedly sold 55 million shares of treasury stock in a €3.3 billion deal. Given their top roles at the Company, Messier and Hannezo

and these other executives knew or were in a position to know about that transaction. The market reaction to the sale caused the Company's share price to tumble, but not before Messier, Hannezo and their cronies had the chance to exercise stock options at a profit. It was not until April 2003 when Messier admitted for the first time that in late 2001 he had sold a huge number of Vivendi shares, worth at least €15 million.

268.    Had the conduct set forth above been taken into account when Hannezo's bonus for 2001 was calculated, that bonus would have been reduced by approximately $148,000.

## APPLICABILITY OF PRESUMPTION OF
## RELIANCE AND FRAUD-ON-THE-MARKET DOCTRINE

269.    At all relevant times, the market for Vivendi's securities was an efficient market for the following reasons, among others:

(a) Vivendi's ADSs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market. Vivendi's ordinary shares actively traded on the Paris Bourse;

(b) As a regulated issuer, Vivendi filed periodic public reports with the SEC and the COB;

(c) Vivendi regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Vivendi was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

270.    As a result of the foregoing, the market for Vivendi's securities promptly digested current information regarding Vivendi from all publicly available sources and reflected such information in Vivendi's stock price. Under these circumstances, all purchasers of Vivendi's

ADSs during the Relevant Time Period (including Plaintiffs) suffered similar injury through their purchase of Vivendi's securities at artificially inflated prices, and a presumption of reliance applies as to claims arising under Section 10(b) of the Exchange Act.

271.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs, as well as other members of the investing public. As described herein, during the Relevant Time Period, Defendants made or caused to be made a series of materially false or misleading statements about Vivendi's business, prospects, operations and financial condition. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Vivendi and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. During the Relevant Time Period, in ignorance of the true financial condition of Vivendi, Plaintiffs purchased or otherwise acquired Vivendi securities at artificially inflated prices. As set forth herein, the market price of Vivendi securities declined materially upon the public disclosure of the true facts which had been misrepresented or concealed, thus causing the damages complained of herein.

## **MATERIALIZATION OF DAMAGES/LOSS CAUSATION**

272.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

273.    As a result of Defendants' dissemination of materially false and misleading information and failure to disclose material facts, the market prices of Vivendi's ADSs and ordinary shares were artificially inflated during the Relevant Time Period.

274. For example, and without limiting the foregoing, on December 22, 2000, Vivendi issued a press release announcing that it had purchased a 35% stake in Maroc Telecom, S.A. ("Maroc Telecom") for approximately €2.3 billion. Vivendi failed to disclose in the press release, *inter alia*, the existence of the Maroc Telecom side agreement, discussed in greater detail above at ¶¶ 94, and 160-163, and in particular Vivendi's commitment to pay an additional €1.1 billion in February 2002 for additional shares of Maroc Telecom. Vivendi also failed to disclose its commitment with respect to Maroc Telecom in its periodic filing with the COB for the period ending June 30, 2001, and in its Form 6-K filed with the SEC on October 17, 2001.

275. Throughout 2001, as set forth in greater detail in ¶¶ 72-175, above, Vivendi continued to disseminate materially false and misleading information and failed to disclose material facts in press releases and interviews, in SEC filings, and in statements to shareholders and analysts, *inter alia,* in order to maintain the artificially inflated prices of Vivendi securities. During that period as well, Messier caused Vivendi to spend approximately $6.3 billion in cash in a massive stock buy-back program. According to the Wall Street Journal, Messier was "[t]rying to prop up the stock price, [but] he instead only sent Vivendi's debt soaring." By December 2001 Vivendi was running out of cash, according to an October 2002 memo from Defendant Hannezo to the COB.

276. In the first two weeks of December 2001, Messier and Hannezo and other senior executives at Vivendi had a series of critical meetings with analysts from Moody's and Standard & Poor's, companies that publish independent credit opinions, research and commentary to assist investors in analyzing the credit risks associated with fixed-income securities. These meetings preceded Vivendi's December 17, 2001 announcement that it would spend almost $12 billion to

107

acquire portions of USA Networks, Inc. ("USA Networks") and Echostar Communications ("Echostar").

277.    Moody's and Standard & Poor's based their rating of Vivendi's credit primarily on the company's debt-to-EBITDA ratio. Because the USA Networks and Echostar transactions required Vivendi to spend a large amount of cash and assume additional debt, Vivendi sought "pre-clearance" in the form of assurances from Moody's and Standard & Poor's that the transactions, when announced, would not result in a downgrade of Vivendi's credit rating by those agencies. Such a downgrade would have made it difficult to borrow money and plunged the company into a cash crisis.

278.    During the meetings with Moody's and Standard and Poor's, Vivendi failed to inform the analysts of certain undisclosed future commitments that would have raised concerns about the company's ability to meet its cash needs, as detailed in ¶¶ 149-173 above. These undisclosed commitments included the Maroc Telecom side agreement, the terms of Vivendi's current account with Cegetel, and Vivendi's investment in a fund that purchased an additional 2% of Telco's shares. Vivendi's senior executives knew that if Vivendi had disclosed its obligations to pay an additional €1.1 billion in February 2002 for additional shares of Maroc Telecom, the possibility it would have to repay the Cegetel current account at any time and certainly no later than July 31, 2002, or its indirect acquisition of additional Telco shares, the credit rating agencies may have declined to maintain their credit rating of Vivendi.

279.    Both Moody's and Standard & Poor's told Vivendi that its debt-to-EBITDA ratio was too high to maintain its investment-grade status. However, both credit rating agencies also told Vivendi that they would not downgrade its credit rating if Vivendi committed to taking

certain debt reduction measures in 2002. Senior officers of Vivendi assured Moody's and Standard & Poor's that Vivendi would reduce its debt by several billion dollars during 2002.

280.    As a result of these assurances, neither Moody's nor Standard & Poor's downgraded Vivendi after it announced the USA Networks and Echostar transactions.

281.    If the undisclosed future commitments had been revealed, the public would have been alerted to Vivendi's future cash requirements, and the market price of Vivendi's securities would have been lower because of concerns about Vivendi's ability to meet its cash needs.

282.    As Defendant Hannezo stated to the COB in his October 2002 memo, and as *Bloomberg* reported on May 14, 2002, Vivendi was close to insolvency at the end of 2001. Vivendi's "cash woes," *Bloomberg* stated, "help explain why the company sold 55 million of its own shares in January [2002]." In a January 7, 2002 press release, Vivendi announced that it had mandated Deutsche Bank AG and Goldman, Sachs & Co. to sell 55 million treasury shares - about half of the shares Vivendi had bought back just months earlier. The approximately €3.3 billion ($3 billion) in proceeds, the company stated, were to be used "mostly to reduce the company's debt."

283.    The sale, coming so closely on the heels of Vivendi's massive shares buy-back program raised, concerns in the market that Vivendi had liquidity problems. Although the offering price of €60 a share was a 4% discount from the previous day's close, the underwriters failed to sell all of the stock, and were required to take "investment positions" in the Company.

284.    The market price for Vivendi securities fell significantly. On January 8, Vivendi shares traded for €59.20 each. By January 30, the share price had dropped to €51.10, with a volume of 15 million shares. The decline continued and, by February 5, Vivendi shares traded for €46.00 each, down 27% from the beginning of the year.

109

285.    The true scope of Vivendi's liquidity problems, however, was not fully revealed until months later. Instead, as detailed in ¶¶ 180-249 and 272-310 and elsewhere, Defendants falsely denied that there was any reason for concern and made affirmative misstatements to the market to attempt to prop up Vivendi's gradually declining share price. In his February 6, 2002 letter to Vivendi employees, which was posted on the Company's website, Messier called the drop in Vivendi's share price "unfair," claiming that the share price had "no relation to our performance," and was "a victim of 'rumors and manipulation'" by speculators. Messier categorically denied that the company had any "hidden risks" or "speculative instruments," and reported that there were no "(bad) surprises" in the 2001 financial results. These statements were materially false and misleading, and had the intended effect of ensuring that the market prices of Vivendi securities remained higher than they would have been had there been full disclosure of Vivendi's true financial condition.

286.    On April 29, 2002, Vivendi issued a press release announcing its "strong" first quarter 2002 Media and Communications results, and reporting a "strong surge of operational free cash flow, up 159% to 1.4 billion euros, well ahead of expectations." The release, issued in New York, further reported that "[n]et debt fell from approximately 19 billion euros to approximately 17 billion euros." The release also reported Media and Communications "revenue organic growth of 13% to 6.8 billion euros; EBITDA growth, up 18% to 1.1 billion euros; and solid operating income growth, up 37% to 408 million euros."

287.    The April 29, 2002, press release also announced purportedly "strong" results for the first quarter of 2002, including a 12% increase in pro forma consolidated revenue to €13.2 billion. The release reported that consolidated operating income grew 11% pro forma to €781 million, excluding goodwill amortization. In the release, Messier commented that the

110

"consolidated financial results for the quarter demonstrate that Vivendi Universal is delivering on the strategy, goals and targets that we have articulated to our shareholders." He claimed further that "strong improvement was achieved in cash management, debt reduction, synergies, management development and revenue growth," and announced that "we are lowering our estimate of Media & Communications year-end Debt/EBITDA ratio to less than 3x by December 31, 2002."

288.    The April 29, 2002 press release further touted the Company's allegedly strong cash flow position, stating that "Media and Communications reported: A strong surge of operational free cash flow, up 159% to 1.4 billion euros, well ahead of expectations."

289.    Following the April 29, 2002 press release, Merrill Lynch, in a research report dated April 30, 2002, rated the Company a "strong buy," premised on the Company's allegedly strong financial position. Specifically, the Merrill Lynch report stated that the "strong buy" recommendation was based, in part, on the fact that "Vivendi has now stated its net debt/EBITDA objective is less than 3x by [the] end [of] 2002. . ."

290.    That same day, April 30, 2002, Vivendi disclosed that it had suffered a €17.01 billion loss in the first quarter of 2002, as it reduced the value of certain acquisitions. The market price for Vivendi shares fell to €36.40. Although the share price had fallen 41% since the beginning of 2002, it was still artificially inflated as a result of Defendants' material misrepresentations and omissions of material facts regarding the financial condition of the Company.

291.    On May 3, 2002, Moody's lowered the Company's long-term debt rating to Baa3, which is the lowest investment grade, and only one notch above "junk" status assigned to speculative investments. According to AFX News, the rating downgrade reflected Moody's

111

concern that Vivendi "might not be able to reduce debt as quickly and comprehensively as planned by the company." In addition, as reported in the October 31, 2002 *The Wall Street Journal* article, news of Vivendi's undisclosed costly put option obligation had begun to surface in the press in May.

292.    That same day, May 3, 2002, Vivendi issued a press release criticizing Moody's decision to downgrade Vivendi's debt, and attempting to downplay its significance. The Company stated its belief that Moody's had not "fully take[n] into consideration the currently poor market conditions," and "the whole of the debt reduction program planned by Vivendi Universal." Vivendi also stated that Moody's "decision has no impact on Vivendi Universal's cash situation. It does not trigger any renegotiation clauses or advance repayments of bank credit lines."

293.    As a result of their efforts to reassure the markets by disseminating false and misleading information, Defendants were able to limit the decline in the price of Vivendi's common stock and ADSs. Vivendi's ADSs closed down only $1.74 (from $30.67 to $29.07), and Vivendi's common stock closed down only €2.25 (from €33.77 to €31.52) on May 3, 2002.

294.    As set forth in greater detail in ¶ 206 above, on May 6, 2002, the *International Herald Tribune* reported that "a detailed report of the company's accounts filed with U.S. regulators" on April 15 revealed that if Vivendi's credit rating slips any further," the company "could be forced to unwind billions of dollars in off-balance-sheet derivatives transactions." The *Herald Tribune* report noted that Vivendi had failed to "mention the possibility of accelerated settlement of debt or swap agreements" in its May 3, 2002 press release. The market price of Vivendi shares dropped to €30.00 on May 7, 2002.

295.    On May 30, 2002, Vivendi issued a press release stating that its "cash situation, which, the Company believes, is comfortable — even assuming an extremely pessimistic market — will enable the Company to continue its debt reduction program with confidence and with a view to creating the best possible value for its shareholders." This press release was false and misleading because Vivendi's cash situation was not "comfortable," and Vivendi, Messier, Hannezo and other Vivendi executive officers knew at this time, or were reckless in not knowing, that Vivendi's cash flow was zero or negative.

296.    Indeed, as reported in the October 31, 2002 *Wall Street Journal* article, the Vivendi board, concerned there was a liquidity problem, had hired Goldman Sachs the day before, May 29, 2002, to analyze the Company's cash situation.

297.    Vivendi's false press release fooled the market. On May 31, 2002, Vivendi ADSs closed up $1.23, at $31.05 and its common stock closed up €1.52, at €33.60.

298.    On June 24, 2002, Goldman Sachs informed Vivendi's top executives and certain members of the board that Vivendi was in danger of having to file for bankruptcy as early as September or October. That day, Vivendi's share price fell 25%, to €18.75. Goldman Sachs repeated its findings to the full board the next day, June 25, 2002.

299.    The following morning, June 26, 2002, at the request of the French COB, Vivendi issued a press release, which responded to media speculation regarding the Company's liquidity. In that press release, Vivendi claimed that it had "around €3.3 billion in unused credit lines * * * to back up its commercial paper outstanding of nearly €1 billion. The cash situation has greatly improved since the beginning of the year." Vivendi also claimed that "[o]wing to its strong free cash flow, combined with the execution of the disposals program and potential bond issues,

Vivendi Universal is confident of its capacity to meet its anticipated obligations over the next 12 months."

300.    Later that day, June 26, 2002, the *Dow Jones International News* reported, Messier had opened an investor conference call "with a comment that the company has no hidden, off-balance sheet liabilities and add[ed], 'We feel very confident looking to our debt and cash analysis with all our commitments of the group for the coming 12 months'."

301.    Vivendi's access to credit, however, was much worse than the June 26 press release and Messier's comments in the investor conference call indicated. In fact, just the day before, on June 25, 2002, at least €900 million of the €3.3 billion in Vivendi credit lines expired. Further, by this date, Vivendi's "cash situation" had not improved since the beginning of the year, but rather had worsened as a result of a demand made weeks earlier by Cegetel's minority shareholders for the repayment of a current account pursuant to which Cegetel made its excess cash available to Vivendi.

302.    Vivendi's June 26, 2002 press release and subsequent comments by Messier, however, had reassured a number of market analysts. For example, on June 27, 2002 Merrill Lynch issued a "strong buy" recommendation for the Vivendi stock, stating its belief that "the rapid share price fall of some 25% in the last two weeks is unwarranted," and its expectation that "ongoing deleveraging and improving confidence in the company's short term liquidity position should begin to revive interest in the shares."

303.    As stated by the SEC in its December 23, 2003 complaint, at paragraph 34,

> Defendants' attempts to reassure the market and to deny that
> [Vivendi] had any liquidity problems were materially misleading.
> Defendants knew, or were reckless in not knowing, that Vivendi's
> financial condition was precarious and that there was significant
> risk that it would experience the liquidity crisis that occurred in
> July 2002.

114

304.    Defendants' June 26, 2002 statements, which were identified by the SEC as "materially misleading," buoyed the market prices of Vivendi securities. On July 1, 2002, Vivendi's shares were trading at €23.90, an artificially inflated price.

305.    On July 2, 2002, Vivendi's debt was downgraded again amid reports that the Company was in danger of default. According to one published report, the downgrade "sparked near-panic selling in Paris" that caused Vivendi shares to plunge 25% for the day, to a new 15-year trading low of €17.8, on a volume of almost 55 million shares. The same credit agency report also disclosed that Vivendi's financial obligations in 2002 could be as much as $3 billion more than – or approximately twice as large as – what most analysts had expected.

306.    Messier still persisted in his efforts to cover up the full extent of Vivendi's cash flow problems and accounting irregularities. That same day, July 2, 2002, *Bloomberg* reported that Messier "told employees in an e-mail that while he may have gone 'too fast, too far,' there are 'no hidden risks' in the company's accounting."

307.    On July 3, 2002, the Vivendi board forced the CEO, Messier, to resign. Panic selling continued, and the prices of Vivendi ADSs and ordinary shares collapsed even further, falling to as low as $13.40 and €13.90 and closing at $15.66 and €13.90, respectively, on huge volume with tens of millions of shares. The board obtained Defendant Hannezo's resignation a few days later.

308.    On July 3, 2002, Vivendi's new management published a press release acknowledging that the Company has "a short-term liquidity issue." The release further disclosed that, by the end of the month, Vivendi had to repay creditors €1.8 billion, and that €3.8 billion in credit lines were up for renegotiation.

115

309. Defendants, however, still did not disclose Vivendi's true financial condition. The public was not yet aware that Defendants were engaging in improper accounting practices that resulted in a material overstatement of Vivendi's reported earnings. Nor had Vivendi yet disclosed the full extent to which it was suffering from a growing liquidity crisis, and how adversely that crisis would affect it.

310. In addition, Messier still refused to admit any wrongdoing. On July 3, 2002, the day of his ouster, Messier was quoted in *The Columbian* as stating that there were "no underestimated liabilities" and "no overvalued assets" on Vivendi's financial statements, and that the Company's previously reported financial results were all "true, genuine and complete." Vivendi's stock price began to rebound, hitting €18.20 on July 18, 2002. The stock closed at €15.90 on August 13.

311. On August 14, 2002, Vivendi's true financial condition was finally disclosed. The Company's new management stated that, pursuant to French GAAP, Vivendi suffered a €12 billion new loss for the first half of 2002 and would take an €11 billion goodwill write-down of depreciated assets. Vivendi also reported that it would have to sell approximately $10 billion in assets in an effort to reduce its debt, which significantly diminished the earnings capacity of the Company. As the *Associated Press* reported on August 14, 2002, Vivendi's new chairman, Mr. Jean-Rene Fortou, admitted that "[w]e are facing a liquidity problem."

312. In response to these further stunning developments, on August 14, 2002, the market price of Vivendi common stock plunged nearly another 25% from its close the previous business day, closing at €11.89. The market price of Vivendi's ADSs suffered a similar decline, closing down $3.67 at $11.66.

116

313.    The closing price of $11.66 on August 14, 2002 for Vivendi's ADSs represented a stunning decline of more that $44.00 per ADS (or 79%) from the inflated levels at which they had traded at the beginning of 2002, and an incredible and near total collapse of $63.84 per ADS – or more than 85% -- from its inflated Relevant Time Period high (in January 2001) of $75.50 per ADS. The price of Vivendi's common stock suffered similarly shocking declines. It had become clear that Vivendi would never again be a large-growth company, as Defendants had portrayed it throughout the Relevant Time Period.

314.    Throughout the Relevant Time Period, Defendants were aware of material non-public information concerning Vivendi's fraudulent conduct (including, *inter alia*, its dissemination of false and misleading accounting statements). Throughout this period, Defendants willfully and knowingly concealed this adverse information, and Plaintiffs' damages were the foreseeable consequence of Defendants' concealment of this information.

315.    At all relevant times, the material misrepresentations and omissions of Defendants particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs, as well as other members of the investing public. As described herein, during the Relevant Time Period, Defendants made or caused to be made a series of materially false or misleading statements about Vivendi's business, prospects, operations and financial condition. These material misstatements and omissions created in the market an unrealistically positive assessment of Vivendi and its business, prospects and operations, causing the Company's securities to be overvalued and artificially inflated at all relevant times.

316.    Unaware of the true financial condition of Vivendi, Plaintiffs purchased and/or acquired Vivendi securities in reliance on the integrity of the market price of those securities

and/or upon the public statements drafted, issued, prepared and/or disseminated by Defendants, and Defendants manipulated the price of Vivendi securities through their misconduct as described herein. Each time information regarding Vivendi's true financial condition was partially and/or fully disclosed, the share price of Vivendi stock fell significantly, and Plaintiffs suffered economic losses as a direct and proximate result of Defendants' misconduct.

## **INAPPLICABILITY OF STATUTORY SAFE HARBOR**

317.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. Moreover, the specific statements pleaded herein were not "forward looking statements" when made, but rather were untrue statements of historical facts or events. To the extent that any of the statements identified herein as materially false and misleading are held by the Court to be forward-looking statements, there were no meaningful cautionary statements identifying important then-present factors that could, and indeed did, cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those materially false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer or director of Vivendi who know that those statements were false when made.

## **CLASS ACTION TOLLING**

318.    Plaintiffs did not know, and could not reasonably have been on inquiry notice before – at the earliest – July 2, 2002 that Vivendi's financial statements and Defendants' other

public statements regarding the Company's financial condition were materially false and misleading. On that date, Vivendi's debt, which had been downgraded to one notch above "junk" status on May 3, 2002, was downgraded for a second time, sparking near-panic selling in Paris. This selling frenzy crushed Vivendi's common share prices, causing the stock to drop 25% to a new 15-year low of €17.80. Following his July 2, 2002 ouster, Messier continued to deny any wrongdoing, steadfastly maintaining that the Company's financial results were all "true, genuine and complete." Moreover, even after being on inquiry notice, Plaintiffs did not know and reasonably could not have known that Defendants had committed fraud until after Plaintiffs conducted a further investigation.

319.   These attempts to reassure the market, however, would ultimately prove futile. On August 14, 2002, Vivendi was at long last forced to reveal its financial woes, announcing that it had suffered a massive $12 billion loss in the first half of 2002 and that it would have to sell $10 billion in assets to reduce its debt. Jean-Marie Fortou, Messier's successor, flatly admitted, "Vivendi Universal is facing a liquidity problem."

320.   Prior to – at the earliest – July 18, 2002, the statutes of limitations on Plaintiffs' claims were tolled by Defendants' active and continuing concealment of their fraud. Further, the tolling of the statutes of limitations on Plaintiffs' claims continued on and after July 18, 2002, due to the filing of a securities class action complaint on that date in Rosenbaum Partners, L.P. v. Vivendi Universal, No. 02 Civ. 5571 (now pending as the Securities Class Action). Plaintiffs were members of the putative class in that action, which asserts claims against Vivendi, Hannezo and Messier pursuant to Section 10(b), Rule 10b-5 and Section 20(a) of the Exchange Act. Those claims arise out of the same facts and circumstances as the claims in this Complaint.

119

321.    By Order dated May 21, 2007, the Court ruled on the plaintiffs' motion for class

certification in the Securities Class Action. The Court certified a class of all purchases of

Vivendi securities located in the United States, England, France and The Netherlands.

Accordingly, the statutes of limitations on Plaintiffs' claims remained tolled between July 18,

2002 and May 21, 2007.

322.    All of Plaintiffs' claims have been brought within the applicable statutes of

limitations, after giving effect to tolling and the relation-back doctrine.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against Hannezo

323.    All Plaintiffs repeat and reallege each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

324.    This Count is asserted against Defendant Hannezo for violations of Section 10(b)

of the Exchange Act 15 U.S.C. ¶ 78(j)(b) and Rule 10b-5, 17 C.F.R. ¶ 240.10b-5 promulgated

thereunder.

325.    During the Relevant Time Period, Defendant Hannezo carried out a plan, scheme

and course of conduct which was intended to and, throughout the Relevant Time Period did: (i)

deceive the investing public, including Plaintiffs, as alleged herein; (ii) enable Vivendi to

complete several acquisitions, as described herein, using its artificially inflated securities as

currency; and (iii) cause Plaintiffs and other members of the investing public to purchase

Vivendi's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan

and course of conduct, Defendant Hannezo took the actions set forth herein.

326.    Defendants Hannezo made untrue statements of material fact and/or omitted to

state material facts necessary to make the statements not misleading in an effort to maintain

120

artificially high market prices for Vivendi's ADSs and ordinary shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendant Hannezo is sued either as a primary participant in the wrongful and illegal conduct charged herein or as a controlling person as alleged below.

327.    Defendant Hannezo, individually and in concert with Defendants, directly or indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Vivendi as specified herein.

328.    Defendant Hannezo's primary liability, and controlling person liability, arises from the following facts: (i) Defendant Hannezo was a high-level executive and/or director at the Company during the Relevant Time Period and member of the Company's management team or had control thereof; (ii) Defendant Hannezo, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) Defendant Hannezo enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) Defendant Hannezo was aware of the Company's dissemination of information to the investing public which he knew or recklessly disregarded was materially false and misleading.

329.    Defendant Hannezo had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that he failed to ascertain and to disclose such facts, even though such facts were available to him.

121

Defendant Hannezo's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Vivendi's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements of the Company's business, financial condition, operations and growth throughout the Relevant Time Period, Defendant Hannezo, if he did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

330.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Vivendi's ADSs and ordinary shares were artificially inflated during the Relevant Time Period. In ignorance of the true financial condition of Vivendi, Plaintiffs, relying on the integrity of the market and/or on the statements and reports of Defendants containing the misleading information, purchased or otherwise acquired Vivendi securities at artificially inflated prices from at least October 30, 2000 to August 14, 2002. The market price of Vivendi securities declined materially upon the public disclosure of the true facts which had been misrepresented or concealed as alleged herein.

331.    Had Plaintiffs known the truth concerning the misrepresented and omitted facts described above, they either would not have purchased or otherwise acquired their Vivendi securities at all, or would have done so only at substantially lower prices.

332.    As a direct and proximate cause of Defendant Hannezo's active and primary participation in Vivendi's scheme to defraud the investing public by, among other things, concealing the fact that Vivendi's operations and financial condition were dramatically weaker than what their public statements portrayed, Plaintiffs suffered damages. Plaintiffs purchased

122

and/or acquired Vivendi securities in reliance on the integrity of the market price of those securities and/or upon the public statements drafted, issued, prepared and/or disseminated by Defendants, and Defendants manipulated the price of Vivendi securities through their misconduct as described herein. Furthermore, Defendant Hannezo's misconduct proximately caused Plaintiffs' losses. Each time information regarding Vivendi's true financial condition was partially and/or fully disclosed, the share price of Vivendi stock fell significantly, and Plaintiffs suffered economic losses as a direct and proximate result of Defendant Hannezo's misconduct. Plaintiffs' damages were a direct and foreseeable consequence of Defendant Hannezo's failure to disclose and their concealment of, *inter alia*, the true state of the business operations and financial condition of Vivendi.

333.    Throughout the Relevant Time Period, Defendant Hannezo was aware of material non-public information concerning Vivendi's fraudulent conduct (including, *inter alia*, its dissemination of false and misleading accounting statements). Throughout this period, Defendant Hannezo willfully and knowingly concealed this adverse information, and Plaintiffs' damages were the foreseeable consequence of Defendant Hannezo's concealment of this information.

## COUNT II

### Violations of Section 20(a) of the Exchange Act Against Hannezo

334.    All Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

335.    Defendant Hannezo acted as a controlling person of Vivendi within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level position, and his ownership and contractual rights, participation in and/or awareness of the Company's

operation and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, Hannezo had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Hannezo was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

336.    In particular, Hannezo had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

337.    Vivendi and the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of his position as a controlling person, Defendant Hannezo is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Hannezo's wrongful conduct, Plaintiffs suffered damages in connection with its purchases of the Company's securities during the Relevant Time Period.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs demand judgment on their behalf as follows:

1.      Awarding Plaintiffs compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

2.      Awarding Plaintiffs the costs of this suit, including reasonable attorneys' and accountants' and experts' fees and other disbursements; and

3.      Awarding Plaintiffs such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all counts so triable.


Dated:  New York, New York
        March 20, 2009


THE SHAPIRO FIRM, LLP

By: _____
     Robert J. Shapiro (RS-3220)
     Jonathan S. Shapiro (JS-3068)
     500 Fifth Avenue, 14th Floor
     New York, New York 10110
     Telephone: 212-391-6464
     Facsimile: 212-719-1616

**BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP**
John A. Kehoe (JK-4589)
Stuart L. Berman
David Kessler
Darren J. Check
Benjamin J. Hinerfeld
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: 610-667-7706
Facsimile: 610-667-7056

*Attorneys for Plaintiffs*